UNITED STATES DISTRICT COURT
DISTRICT OF NORTH DAKOTA
SOUTHWESTERN DIVISION

| | | |
|---|---|---|
| Bruce Roemmich, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **FINDINGS OF FACT,** |
| vs. | ) | **CONCLUSIONS OF LAW,** |
| | ) | **AND ORDER** |
| Eagle Eye Development, LLC; | ) | |
| Leland Bertsch; Jane Bertsch; | ) | |
| Janet Scholl; and Jon Wagner, | ) | |
| | ) | Case No. 1:04-cv-079 |
| Defendants. | ) | |

## PROCEDURAL BACKGROUND

Plaintiff Bruce Roemmich filed this action on April 13, 2004.  In his complaint, Roemmich alleges four separate causes of action including: (1) unfairly prejudicial conduct towards a member; (2) breach of fiduciary duty to act in good faith towards another member; (3) breach of fiduciary duties to act in good faith by officers of a limited liability company; and (4) dissenters rights.  (Doc. No. 1)  The statutory basis for all four causes of action is found in Chapter 10-32 of the North Dakota Century Code, commonly referred to as the North Dakota Limited Liability Company Act.[1]

On May 10, 2004, the defendants filed a joint answer to the complaint.  The answer also included a counterclaim by Eagle Eye Development, LLC and Leland Bertsch seeking to divest Roemmich of his 30% interest in Eagle Eye Development based on claims of breach of contract and for rescission.  (Doc. No. 3)

On September 13, 2005, the court (Chief Judge Hovland) entered an order granting Roemmich's motion for summary judgment of dismissal of the counterclaim on statute-of-

---

[1]  All references to chapter 32-10 will be to the current version unless otherwise indicated.  The court is unaware of, and the parties have not cited the court to, any material changes to chapter 10-32 that are relevant to this action.

limitations grounds and granting and denying, in part, defendants' cross-motion for summary judgment.  In ruling on defendants' motion for summary judgment, the court held that any of plaintiff's claims that had accrued prior to April 13, 1998, were barred by the six-year statute of limitations, but left open the issue of what claims had accrued prior to that date.  (Doc. No. 53)

Subsequent to the court's ruling on the cross motions for summary judgment, the parties consented to a court trial before the undersigned magistrate judge.  (Doc. Nos. 60, 61, 62)

Defendants next brought a motion seeking to exclude all evidence relating to acts occurring prior to April 13, 1998. (Doc. No. 58)  What defendants were really seeking was a more definitive ruling with respect to which of plaintiff's claims were barred by the statute of limitations.  The court ruled that claims seeking affirmative relief relating either to plaintiff's removal as governor or the defendants having allegedly submitted fraudulent change orders to the federal government were barred by the six-year statute of limitations, but that evidence regarding these matters might be relevant for other purposes.  (Doc. No. 73) With respect to the remaining claims, the court ruled there were material facts in dispute as to whether the claims had accrued prior to April 13, 1998. Also, in the same order, the court limited the trial to a determination of primarily the liability issues.

Defendants also filed a motion to amend their answer to assert a counterclaim, again seeking to divest Roemmich of his 30% interest, but this time based on claims of tortious interference with contract and prospective economic advantage, breach of fiduciary conduct towards a member, and breach of the duty to act in good faith toward another member.  (Doc. No. 59)  This motion was denied on statute of limitations grounds for the same reasons the initial counterclaim was dismissed. (Doc. No. 72)

The court trial was held on December 12-16, 2005, and post-trial briefing was completed in January 2006.  The court also held a telephonic hearing with the attorneys for the parties on August 9, 2006, to seek their input with respect to a draft of the relief that the court contemplated awarding and to discuss the issue of costs and attorney fees.  The parties agreed that the issue of costs and attorney fees should be the subject of further proceedings once the court issues its initial decision.

Based on the evidence submitted and the arguments of counsel, the court makes the following findings of fact, conclusions of law, and order for judgment.

## FINDINGS OF FACT

**Background re the parties**

1.      Defendant Leland Bertsch ("Bertsch") is a long-time contractor/developer residing in Bismarck, North Dakota.  His principal business is Bertsch Construction, Inc. ("Bertsch Construction"), which he owns together with his wife, defendant Jane Bertsch ("Jane Bertsch") (collectively referred to as the "Bertschs").  Bertsch began his construction business in 1977 and incorporated it in the early 1980's.  Bertsch also owns interests in several other closely-held, special-purpose entities.

2      Defendant Jon Wagner is married to Bertsch's sister.  He is a graduate of the University of North Dakota (1968) with a degree in accounting.  Wagner is employed as Bertsch Construction's full-time accountant.  Previously, he worked for a public accounting firm for a short time and then held a series of accounting positions with other employers.

3.      Plaintiff Bruce Roemmich is the brother of Jane Bertsch.

3

**Background  re development of the post office projects**

4.      In about 1995, Bertsch decided to bid on several projects for the construction and

leasing of post office buildings to the United States Postal Service ("USPS") under long-term leases.

Bertsch was the successful bidder on three projects relevant to this action:  Cocoa Beach and Mims

Florida in early 1995, and Mora, Minnesota in October 1995.  For each project, Bertsch entered into

a lease agreement with the USPS in advance of construction pursuant to which he agreed to purchase

the real estate upon which the post office would be built[2] and then build the post office facility

according to plans and specifications developed by the USPS.  In exchange, the USPS committed

to rent the completed post office for an extended term, either 20 or 25 years, at a fixed annual rental

amount with certain options for renewal and/or for purchase.  After completion of construction, lease

amendments were negotiated for each project to reflect the final terms of the lease, including

increases in the fixed annual rentals to compensate for changes required during construction.

The following are the dates of the initial leases prior to construction, the dates of the final

lease amendments after project completion, and the length of the primary lease terms, as amended,

for each project:

|  | Initial Lease Date | Amended Lease Date | Primary lease term |
|---|---|---|---|
| Mims, Fl. | 2/23/95 | 1/23/97 | 25 yrs to 6/16/2021 |
| Cocoa Beach, Fl. | 3/9/95 | 3/24/97 | 25 yrs to 10/12/2021 |
| Mora, Mn. | 10/27/95 | 9/11/97 | 20 yrs to 10/30/2016 |

---

[2] For each project, the USPS had chosen the site location and obtained an option to purchase the real estate.
As part of the lease arrangements, Bertsch took an assignment of the purchase options, which he then exercised.

4

The lease amendment on the Mims project was signed by Bertsch and his wife.  On the Cocoa Beach Project, Bertsch signed as president of Eagle Eye Development, LLC.  And, on the Mora project, Bertsch signed the lease amendment in his personal capacity.

**Creation of Eagle Eye**

5.      On June 12 1995, Bertsch and his wife  created Eagle Eye Development, LLC ("Eagle Eye") pursuant to North Dakota's Limited Liability Company Act codified at N.D.C.C. ch. 10-32 by the execution of an Operating Agreement and Membership Control Agreement.  Eagle Eye was registered with the North Dakota Secretary of State the next day.  According to the Membership Control Agreement, Bertsch made a 95% capital contribution and received a 95% voting interest and his wife Jane made a 5% contribution and received a 5% interest.

6.      Although there is no specific limitation in the corporate documents, Bertsch's intent at the time Eagle Eye was created was to limit the activity of the company to the constructing and leasing of post office buildings to the USPS, starting with the two in Florida and then possibly others.  Bertsch viewed the USPS projects as providing long-term investments for retirement that would build in value as the debt incurred to acquire the land and construct the facilities was paid off by  rentals from the USPS, a stable long-term tenant.

**Roemmich becomes member of Eagle Eye & assumes field supervision of Florida projects**

7.      After Bertsch secured the bids on the initial projects in Florida and before Eagle Eye was created, Bertsch and his wife decided to involve Roemmich, Jane Bertsch's brother, who was living in Billings, Montana.  With the understanding that he would acquire a 30% ownership interest in the post office projects,  Roemmich quit his job in Billings and temporarily relocated to Florida to oversee the construction and overall development of the two Florida projects.  While providing

on-site project supervision, Roemmich was paid $400 per week, plus expenses, and was given health coverage.  In addition, he was housed in a condominium paid for by the projects and his vehicle expenses were paid.  Roemmich's start date on the projects' payroll was April 3, 1995.

8.      On June 28, 1995,  after Roemmich had relocated to Florida, a meeting of the board of governors for Eagle Eye was held.  Roemmich was given a 30% interest in Eagle Eye of which 25% came from Bertsch and 5% from his wife Jane, which constituted her entire interest.  Bertsch was named president and chief manager and continued as one of two governors.  Roemmich was appointed to the offices of secretary and treasurer and also became a governor.  The next day another meeting of the board of governors was held and Roemmich was also named executive vice-president. **Initial understandings and expectations of the parties**

9.      Prior to Roemmich becoming involved, Bertsch had already expended significant effort on the Florida projects (1) investigating the opportunity of constructing and leasing the post office buildings, (2) submitting bids on the two projects, (3) negotiating and executing the initial lease documents, and (4) arranging for (but not finalizing) the construction financing.  All of this activity required significant expertise and experience.  Or, to put it somewhat differently, prior to Roemmich becoming involved, Bertsch and his wife had already created the opportunity for significant gain if the Florida projects could be successfully completed.  They had also taken all of the risk in that they had personally signed the lease contracts promising to construct and lease the Florida facilities at rental rates that were fixed in advance of construction.  From the Bertschs' perspective, they viewed Roemmich as getting a good deal even considering the fact he was required to quit his present job and relocate temporarily to Florida with no guarantee of future employment or additional projects being constructed.

6

10.     Also, by the time Roemmich became involved, Bertsch had already decided that he would provide overall project supervision and management, that the projects would be constructed primarily by retaining local contractors, and that Bertsch Construction would provide support services, including accounting (*i.e.*, keeping the project books and records, processing and paying construction invoices, etc.), secretarial support, and office space and equipment.  This was an approach that Bertsch had used in developing other projects.  Also, Bertsch had already decided that a special-purpose entity would be created to actually own the facilities, which in this case was Eagle Eye.

11.     There was considerable disagreement at trial about what the mutual expectations of the parties were when Roemmich first became involved.  Unfortunately, there was no written agreement.

Based on the credible evidence, the court concludes that the parties agreed Roemmich would quit his present job in Billings and relocate temporarily to Florida to provide on-site supervision for the construction and development of the two Florida projects.  And,  in exchange for agreeing to do these things, Roemmich would receive a 30% equity interest in the projects and would be paid $400 per month, plus expenses (including housing), and health insurance.  In other words, the understanding was that Roemmich would earn his interest rather than, for example, paying the Bertschs for the 30% interest given to him, making a capital contribution to the projects, and/or assuming any of the lease liabilities that already had been undertaken by the Bertschs.  Further, the parties both contemplated that Roemmich would have an active say in the management of Eagle Eye.

Further, the assumption of both parties was that no additional financial commitments would be required by the parties personally, except for the Bertschs possibly having to guarantee the interim construction financing.  Based on the leases already in hand and the contributions already made by the Bertschs, the parties anticipated the projects would essentially finance themselves, and Bertsch represented to Roemmich that he already had the necessary commitments for the interim financing on the Florida projects.  Finally, both the Bertschs and Roemmich understood that the projects were long-term investments that, hopefully, would grow in value as the lease payments from the USPS (a blue-chip tenant committed to long-term leases) paid off the debt incurred to purchase the real estate and construct the buildings.  Consequently, both parties understood that there would not be money to make significant distributions to the members for a number of years unless the USPS elected to exercise one or more of its purchase options.

12.     The court finds, however, that there were no mutual agreements with regard to a number of other important matters and that Roemmich accepted, at least initially, the decisions already made by Bertsch in terms of project structure.  The "looseness" in the understandings between Roemmich and the Bertschs, in large part, was due to the fact that Roemmich was family and an expectation that the other details would get worked out.

More specifically, the court finds that Roemmich accepted the use of a special purpose entity to hold the projects and using Bertsch Construction to provide project support services.  Although Roemmich later questioned the involvement of Bertsch Construction and the compensation it received, a number of months went by after Roemmich became involved without any protest about Bertsch Construction's involvement.  In fact, early in the projects Roemmich voted in support of

8

Wagner becoming the secretary of Eagle Eye.  Wagner was employed by Bertsch Construction and was doing the accounting and invoice-processing for Eagle Eye.

Also, the court finds that there was no mutual understanding regarding the following:  (1) who would provide additional construction financing if the initial financing proved to be inadequate due to unforeseen reasons, (2) whether additional projects would be considered beyond the two Florida projects and how those projects would be financed during construction, (3) what compensation Bertsch Construction would be entitled to receive during the development of the projects, and (4) what the role of the respective parties would be after the initial projects were completed and Eagle Eye was in the phase of maintaining the properties and collecting rents.

13.    Roemmich claims there was an understanding that Bertsch would be responsible for providing financing for all of the projects and that Bertsch breached this understanding when Eagle Eye developed cash-flow problems requiring additional borrowing, including Roemmich and the Bertschs having to sign notes secured by mortgages on their respective residences.  Based on the credible evidence, the court concludes that Bertsch advised Roemmich that he had commitments for the interim financing for the Florida projects, but that there was no understanding with respect to what the situation would be in the event the projects overran or what the arrangements would be for future projects.  Any expectation by Roemmich that Bertsch would cover the interim construction financing, beyond what  was originally contemplated as being necessary, and no matter what the circumstances, was both unilateral and unreasonable.

14.    As noted, the expectation of the Bertschs was that Roemmich would "earn" his ownership share by providing on-site project supervision for the Florida projects.  However, within several months after Roemmich became involved, Eagle Eye was created and Roemmich was given

9

an immediate 30% ownership interest in Eagle Eye.  Bertsch later claimed that Roemmich failed to earn his interest when he left Florida before the Florida projects were completed.  Based on the credible evidence, there was no explicit understanding regarding what would happen if Roemmich did not stay with the Florida projects until the projects were completed.  The parties simply did not contemplate this occurring.  The court finds that the transfer of the 30% ownership interest in Eagle Eye to Roemmich was unconditional when it was made.

15.     Roemmich complains about the fact that Bertsch and Bertsch Construction both received compensation for their efforts during construction of the projects.  The court concludes that any expectation by Roemmich that Bertsch Construction would not be entitled to compensation for the value of  the services it contributed to the projects was both unilateral and unreasonable.  The court finds, however, that Bertsch and Roemmich discussed the fact that neither would be able to take money out of the corporation for some time and that, initially, Bertsch did not intend to pay himself for the work he was doing,  but that he later changed his mind after Roemmich  abandoned the Florida projects prior to completion and after problems developed that required more of his time.

**Early history of Eagle Eye**

16.     Shortly after the creation of Eagle Eye in June 1995, the corporate records reflect meetings of the board of governors to approve the construction financing for Cocoa Beach and to establish bank accounts for Eagle Eye. Later, in November, meeting minutes for the board reflect approval  of  an  application  for  construction  financing  for  the  Mora,  Minnesota  project.   On December 7, 1995, another meeting was held for the purpose of naming Wagner as secretary of the corporation in place of Roemmich, apparently for convenience purposes in terms of having another

person in Bismarck to sign corporate documents.   However, Roemmich continued as executive vice-president and treasurer, as well as being one of the two governors.

17.     There was a period of transition in terms of integrating the projects into Eagle Eye. While the parties were doing business in the name of Eagle Eye beginning with its formation in 1995, including distribution of losses to the partners for tax purposes, the initial contractual relationships with the USPS were with the Bertschs, and the leases, or amended leases, were not formally assigned to Eagle Eye until much later.   At all times, the USPS considered the Bertschs personally to be the contractually responsible parties under the original leases.

18.     Beginning in 1996, the corporate records of Eagle Eye begin to become more spotty and less regular, at least when measured by the early pattern established in 1995.   For example, separate construction financing for the Mora Project was obtained in March 1996.   The corporate records contain a certificate of a resolution stating that the board of governors had met on March 8, 1996, to approve the additional financing from the BNC National Bank, but there are no minutes for such a meeting.   Also, beginning in 1996, a series of loans were made by the Bertschs, Bertsch Construction, and Roemmich to obtain additional funds for Eagle Eye, and there is no documented action by the board of governors approving these transactions as there had been for earlier loans.

**Problems with the Cocoa Beach Project and the need for additional construction funds**

19.     The initial construction financing for the Cocoa Beach project proved inadequate as problems developed with the project.   At Cocoa Beach, the city refused to approve the  initial plans developed by the USPS and upon which Bertsch had submitted his bid.   This resulted in new plans having to be prepared, which, in turn, resulted in project delays and a number of change orders, both of which drove up project costs and placed Eagle Eye in a cash-squeeze.   Also, contributing to the

cash-squeeze were changes at the Mora, Minnesota project that increased the cost of that project as well, but to a lesser extent.

20.     To complete the three projects, the Bertschs and Roemmich personally borrowed money and mortgaged their residences.  However, the loan that Roemmich was responsible for, from which advances totaling $98,000.00 were made in 1996, was satisfied in April 1997, when permanent financing became available and was among the first of the loans to be satisfied.  In addition to the loan was secured by their personal residence, the Bertschs advanced other monies to Eagle Eye personally and through Bertsch Construction, including, relying upon financing that been obtained for other projects that Eagle Eye was not involved in.

Most, but not all, of the additional money that the parties were forced to put into Eagle Eye was borrowed initially from BNC National Bank ("BNC").  While there are notes evidencing the borrowing by the Bertschs, Bertsch Construction, and Roemmich from BNC, there was no formal documentation in terms of notes, or other evidence of debt, obligating Eagle Eye for this money until December 1997.  But, as the money was put into Eagle Eye in 1996, accounts were set up in Eagle Eye's books documenting the flow of the money.

Section 3.08 of Member Control Agreement for Eagle Eye, which was in place at the time this borrowing was done, provided that the members were not obligated  to make additional capital contributions or loans to Eagle Eye.  In other words, if the company ran into trouble, there was no obligation on the part of any member to bail the company out.

Section 3.08 also required board of governors approval for any member loans, and  there is no evidence that any of this lending was formally approved by the governors when it was made although later most of the financing was subsequently ratified by the members.  Some of the

12

additional member lending took place while Roemmich was still on the board of governors, including the loan that he guaranteed, and there is no evidence that Roemmich objected to this loan on the grounds that it had not been formally approved by the board of governors.

**Roemmich walks off the Florida projects and his replacement as governor**

21.     During the latter part of 1995 and the first part of 1996, Eagle Eye was slow in paying a number of the contractors on the Florida projects because of the cash-squeeze.  Feeling the direct pressure of the contractor complaints, and after an attempted charge to a company credit card was denied because it had reached its maximum, Roemmich left the projects on June 7, 1996, and never returned.  At that point, physical construction at Mims, Florida was virtually complete and was scheduled for a walk-through with the USPS the next week.  However, some punch-list work remained along with completion of a number of administrative matters, including resolving change orders and amending the lease with the USPS to reflect final project costs.

Cocoa Beach was between 70% - 80% complete when Roemmich left, and significant problems remained in terms of completing construction, resolving claims with the contractors, preparing and negotiating change orders with the USPS, and negotiating an amended lease to reflect the significant cost overruns.

22.     Prior to Roemmich walking off the Florida projects, relationships among the parties had already started to become strained.   A significant personality conflict had developed between Roemmich and Wagner.  Roemmich believed Wagner was not giving him proper deference as a member and officer of Eagle Eye and was keeping him on a short leash in terms of his expenses. Eventually, Roemmich penned a note to Bertsch stating that Wagner should be replaced because, in Roemmich's view, he was jeopardizing the company due to a  purported lack of business

experience.  Further, the credible evidence is that Roemmich threatened Wagner on at least two occasions.  One was during a meeting on April 12, 1996, which was witnessed by Eagle Eye's attorney Dave Tschider and is discussed in more detail below.  The second occasion was during a phone call in 1996 during which Roemmich stated to Wagner that he would come up to Bismarck and "squeeze his head like a pimple."

23.     On April 12, 1996, five days after Roemmich had left the projects, a meeting was held in Bismarck that was attended by Bertsch, Roemmich, Wagner, and Tschider.   During the meeting, Roemmich became upset and physically threatened Wagner.  Afterwards Bertsch decided to call a special meeting of the members, board of governors, and officers of Eagle Eye to be held on June 24, 1996, and a notice of meeting was prepared indicating the stated purpose for the meeting was the "Removal and election of Governors and Officers."  Bertsch had concluded that Roemmich needed to be replaced given what he considered to be Roemmich's demonstrated lack of stability.


24.     Upon leaving the Florida projects, Roemmich engaged Greg Larson, a Bismarck, North Dakota attorney to represent him.  It is not clear whether he did so before or after the April 12 meeting.  However, Larson wrote a letter to Eagle Eye's attorney David Tschider dated June 13, 1996.  The letter stated that Roemmich had just received a notice of a special meeting of Eagle Eye scheduled for June 24, 1996, and requested the following documents:

1.      Articles of Organization
2.      Minutes of Organizational Meeting and Waiver of Notice of such meeting
3.      Statement of Consent to Serve as Registered Agent
4.      Operating Agreement
5.      Financial Statement of LLC
6.      Any Buy-Sell Agreement
7.      Any Agreement to Form the LLC
8.      Any Business Continuation Agreement

14

9.      Any Schedule of Contributed Assets
10.     Any other documents pertinent to the LLC

Attorney Larson again wrote Tschider on June 18, 1996, thanking him for providing the requested documents and asked for additional documents regarding the authority of Eagle Eye to do business in Florida and Minnesota.

25.     On June 24, 1996, a special meeting of the Eagle Eye members was held.  The only member in attendance was Bertsch; Roemmich did not attend either in person or through his attorney.  Roemmich was removed as a governor and replaced by Jane Bertsch.  This was immediately followed by a special meeting of the governors at which time Roemmich was also replaced as treasurer by Jane Bertsch.  However, Roemmich remained an executive vice-president.

26.     After Roemmich left the Florida projects, Eagle Eye stopped paying his salary.  The total that Roemmich had earned in salary (exclusive of benefits, housing, and reimbursements for expenses) from when he started in April 1995 to when he left in June 1996 was approximately $25,000.

**Roemmich and Bertsch relationship further deteriorates, Roemmich's demands for additional information, and allegations of misconduct**

27.     On June 25, 1996, Eagle Eye's attorney wrote Larson informing him that Roemmich had been removed  from his positions as governor and treasurer, but that he retained his position as executive vice-president.  The letter also talked about the possibility of Roemmich being reinstated as a governor so that he would continue to receive notices affecting Eagle Eye that otherwise would not be provided to him as an officer and member.   It also extended the offer that Roemmich and Larson would be permitted "unobstructed access" to the records of Eagle Eye.

28.     Tschider again wrote to Larson on July 3, 1996, stating that he had not heard from Larson about whether Roemmich was interested in being reinstated as a governor. He also indicated that Bertsch would consider buying out Roemmich's interest if Roemmich was interested, stating more particularly:

> In generating a price, Lee requested that I remind all interested parties that for the next 25 years, all rents and profits will be utilized to satisfy the financing on the projects. For the next 25 years, there will be no distributions from the company to its members. In fact, over the next 25 years, it may be necessary for the members to provide additional cash for painting, insurance, and other miscellaneous items as required by the terms of the lease.

At that point, the projects had not been finalized and there was no guarantee that amended lease terms could be negotiated to cover the project overruns.

29.     Attorney Larson continued to represent Roemmich through at least March 1997, which is the date of his last correspondence. In particular, he continued to correspond with Tschider and during this time frame Roemmich was provided with a significant amount of information regarding Eagle Eye and was also afforded the opportunity of inspecting the company's records personally or through his attorney. On July 10, 1996, attorney Larson responded to Tschider's letter of July 3, 1996, stating that Roemmich was not interested in a buyout, but indicating that Roemmich would be interested in being reinstated as a governor. Larson also expressed concern about certain subcontractors having not yet been paid. He further indicated that arrangements would be made to view Eagle Eye's records and requested copies of the last six months of bank statements. On August 2, 1996, attorney Larson followed up his July 10, 1996, letter with another letter to Tschider stating that the information requested in the July 10 letter had not yet been provided. On August 14, 1996, Wagner responded and forwarded to Larson the following information:

16

a.      Bank statements that had been copied earlier and left for Roemmich for the
period from June 1995 though June 2, 1996.

b.      Loan inquiries that Roemmich had acquired from the Bank.

c.      Financial reports as of August 8, 1996.

Wagner also indicated that he would forward the balance of the bank statements and would make available Eagle Eye's development records.  He also requested that Larson contact him directly to save on Tschider's fees.

30.     In the fall of 1996, Roemmich began negotiating with a third party over the possible sale of his interest in Eagle Eye and the third party had some communications with Eagle Eye's attorney.  At that point, Bertsch became concerned that the prospective purchaser had not been given adequate information by Roemmich as to the current state of Eagle Eye's finances and the fact that final lease arrangements were still pending with the USPS on all three projects.  Bertsch wrote both the potential purchaser and Roemmich expressing these concerns and advised that his position was that Roemmich had breached an agreement regarding the acquisition of his ownership interest by abandoning the Florida projects prior to completion.  Bertsch stated that these matters would not be an impediment to a sale, but they needed to be discussed.   He also stated to Roemmich that it was necessary the two communicate to try to resolve matters.   Roemmich responded to these communications by sending a letter to his sister as treasurer of Eagle Eye demanding a certified financial report showing final costs for the three post office projects.

31.     On November 19, 1996, Bertsch, his wife, and Wagner sent Roemmich a jointly signed letter with an updated financial report through October 31, 1996, which included a detailed trial balance.  In the letter, they outlined the current status of the projects, stressing that the projects

were not yet final even though the buildings had been completed and rent was being paid pursuant

to the initial lease terms.  They advised that the final lease terms, including the rental rate for Cocoa

Beach, had yet to be agreed upon.  They also stated that project costs were still being incurred and

that total project costs were not yet available for any of the three projects.  Finally, they pointed out

that permanent financing still needed to be obtained for all of the projects.

32.     In late November 1996, Roemmich wrote a five page letter addressed to the

defendants, other members of Roemmich's family, and Dave Tschider.  In the letter, Roemmich

voiced complaints about not being provided adequate information, what he claimed was an

undocumented attempt to remove him as governor, and decisions being made without his consent

and approval. Without specifically naming Bertsch, he clearly communicated his belief that Bertsch,

and possibly others, were involved in fraud, tax violations, and other criminal conduct.  He

threatened to contact federal and state authorities, contractors retained by Eagle Eye, and banks

providing financing to Eagle Eye of the suspected wrongful conduct unless he received responses

within two days to his complaints.  When satisfactory responses were not forthcoming, Roemmich

both called and wrote the bank providing the construction lending claiming there was going to be

litigation over Eagle Eye and asking that the bank place a freeze on the accounts and only allow

withdrawals accompanied by three signatures: Lee Bertsch, Dave Tschider, and Bruce Roemmich.

Eagle Eye's attorney then talked to Roemmich about his letter and followed up in writing

with letters dated December 3 and 5, 1996.  In the first letter, Tschider advised Roemmich that he

had been terminated as governor some months ago and that he had no authority to issue directions

to the bank on behalf of Eagle Eye.  He also warned Roemmich that he better have his facts straight

and supporting documentation for the allegations he was making because, if not, he likely would

face legal action for tortious interference with contract, libel, and slander.  In the second letter, he

attempted to answer specific questions regarding the financial information that had been sent to

Roemmich.  Included was an explanation of certain costs questioned by Roemmich.  Tschider stated

that the costs were accrued payables for Bertsch Construction's 3% overhead fee.

**Completion of projects, execution of amended leases, and retention of Bertsch Construction
to provide project management post-construction**

33.     Bertsch was eventually successful in negotiating a new deal with the USPS to reflect

the significant project overruns on the Cocoa Beach project, but this took until the spring of 1997

to complete and involved a significant amount of document preparation, correspondence, phone

contacts, and a two-day meeting in Atlanta, Georgia with the USPS.   On behalf of Eagle Eye,

Bertsch submitted $355,800.65 worth of changes to be reflected in an amended lease with the USPS.

The USPS approved $280,570.70 of the additional costs, of which $102,800.25 was amortized as

additional rent and the remaining $177,770.05 was paid by cash payment.  Of the $280,570.70 that

the USPS approved, $46,761.78 was recognized as additional profit and overhead at 20% of the

additional costs allowed.

34.     Bertsch also worked out amended leases on the other two projects.  The Mora project

also presented its own unanticipated problems that required more of Bertsch's time than originally

contemplated, including overseeing completion of construction work left unfinished by a principal

contractor and resolving change orders and construction liens.

35.     In January 1997, Bertsch, with the assistance of Wagner, developed a management

agreement between Eagle Eye and Bertsch Construction for the post-construction management of

the post office projects.  The motivation for formalizing an arrangement was the requirement of the

lender providing the long-term mortgage financing.

19

Wagner signed the agreement on behalf of Eagle Eye in his capacity as secretary and Bertsch signed on behalf of Bertsch Construction. According to the written agreement, Bertsch Construction would be responsible for the management of the projects, dealing with the USPS, overseeing maintenance and repairs, and providing accounting and tax-preparation services. The agreement provided that Eagle Eye would reimburse Bertsch Construction for its out-of-pocket costs with a markup for 10% overhead and 10% profit. The agreement was silent, however, as to what amounts would be charged for the time spent by Bertsch Construction personnel, *i.e.*, Bertsch, Wagner, and Bertsch Construction's secretary.

There is no evidence of the 1997 management agreement being approved by the Eagle Eye board of governors or the members when it was executed. However, the Eagle Eye Operating Agreement creates the office of chief manager and empowers the chief manager with, among other things, the "general active management of the business of the Company." Further, there is nothing in the Operating Agreement or the Member Control Agreement that limits this authority, and there is no evidence that the members or board of governors ever placed any limits on this authority.

Under the terms of Eagle Eye's organizing documents, Wagner lacked the authority to enter into the contract. However, even though Bertsch signed the agreement on behalf of Bertsch Construction and not Eagle Eye, he possessed the necessary authority to enter into the agreement on behalf of Eagle Eye as its chief manager. Further, as discussed in more detail below, the management arrangement with Bertsch Construction was discussed and implicitly ratified at an annual meeting of the members in February 1998. Also, at that time, the amounts that would be charged for time spent by Bertsch Construction personnel for accounting and secretarial services were established.        36.        The corporate records contain a resolution of the board of governors

20

authorizing Bertsch to execute financing documents with All American Life Insurance Company for the long-term mortgage financing.  The money from this financing was used primarily to refinance the construction lending, pay amounts owed to Bertsch Construction, and to retire the note guaranteed by Roemmich and secured by a mortgage on his residence.

After the long-term mortgage money became available, the post-construction financing consisted of the mortgage money borrowed from All American Life, a working capital note at BNC, and certain payables still owed to the Bertschs on loans obtained by them from BNC , including the loan secured by the mortgage on their personal residence.  Later, the working capital loan with BNC was refinanced in 1998 with the Bank of Glen Ullin and then again in 1999 with the Union State Bank of Fargo.  As part of the refinancing of the working capital loan in 1999, the size of the loan was increased to retire a substantial portion, but not all, of the money owed the Bertschs.

**1997 Annual Meeting**

37.     An annual meeting of the members of Eagle Eye was held on May 17, 1997, pursuant to notice accompanied by an agenda.  The agenda stated the topics of discussion would be the 1995 and 1996 tax returns, the current financial report, the arrangements made for the permanent financing, and other discussion.  Bertsch sent a letter to Roemmich with the notice further discussing the topics for the meeting and stating the meeting should be without attorneys to save expenses.  Bertsch advised, however, that Roemmich may want to bring along the person with whom he was negotiating for the sale of his interest and also stated that the parties needed to "clear the air."

38.     Roemmich attended the May 17, 1997, annual meeting.  Not surprisingly, given the prior history, the meeting became contentious and broke up after Roemmich continued to accuse Bertsch of fraud.  The parties disagree about what took place prior to the break up of the meeting.

Eagle Eye's books contain a set of minutes that Wagner testified were accurate and that he prepared following the meeting based upon his recollection of what had taken place.  Roemmich contends that much of what is in the minutes has been made up.  He contends the meeting was very short and was abruptly terminated by Bertsch once Roemmich started asking questions.

The believable and credible evidence is that the meeting minutes prepared by Wagner are reasonably accurate as to what took place.  The court makes this determination based on Wagner's and Bertsch's testimony, which the court concludes is the more credible.  Further, the particular wording of the minutes is consistent in tenor with what else had been taking place and with a person attempting to document what had occurred.  If the minutes had been made up simply to paper over potential problems, the court believes the wording would have been much different.  More simply, the particular wording used, warts and all, supports a finding of credibleness in terms of what was reported.

39.     The following matters, among others, were discussed at the May 17, 1997, annual meeting:

a.     The 1995 and 1996 financial reports and income tax returns were handed out.

b.     Roemmich reviewed the loan papers from the mortgage lender providing the long term financing and asked questions about the insurance coverages.

c.     Roemmich asked for, and was provided with, the revised rental amounts and also requested and received confirmation that the leases were now all in Eagle Eye's name and that the lease payments were being made to Eagle Eye.

d.     Roemmich asked about payables in the balance sheet to Bertsch and was informed that these were amounts that the Bertschs had put into Eagle Eye, which, at the time

the balance sheet was prepared, consisted of approximately $24,000 in cash, $80,000 borrowed from BNC based on a personal note, and $85,000 borrowed and secured by a mortgage on the Bertschs' personal residence.

e.    Roemmich asked how much was paid to Bertsch Construction and was told that it was 3% of the project costs and not the 5% that had been promised. Roemmich asked to see a copy of the contract and was told by Bertsch that the agreement was a verbal one.

f.    Roemmich asked about the $34,800 labeled as compensation for Bertsch. Bertsch explained that they had capitalized $400 per week from the start of the project and paid that to him. Roemmich complained about the fact that everyone was getting money out of Eagle Eye but him, and Bertsch reminded Roemmich that he had been paid the same weekly amount for time he was in Florida plus housing and other expenses.

g.    Roemmich started asking about certain project costs at Cocoa Beach and accused Bertsch of fraud, and Bertsch questioned Roemmich why he left the Florida projects. Bertsch and his wife also asked Roemmich what he wanted and what he was trying to accomplish by making the allegations of fraud. Bertsch told Roemmich that he had a good deal and in 20 years would almost be able to retire, but that, if Roemmich filed a lawsuit (as he had been continually threatening to do), Bertsch would bring a counterclaim and contest his 30% ownership share.

**Roemmich's continued allegations of misconduct, the 1998 annual meeting, and other the post-construction activity of Eagle Eye**

40.     A special meeting of the board of governors was held on January 16, 1998, to authorize an application for a loan from the Bank of Glen Ullin to refinance the working capital note at BNC.  Minutes were prepared for this meeting.

41.     An annual meeting of the members, governors, and officers of Eagle Eye was held on February 23, 1998.  Formal minutes were prepared for what occurred at this meeting, which was not attended by Roemmich.  Among the items considered at that meeting were the following:

a.      The financial status of Eagle Eye was discussed, including the projection of paper losses through 2003 after consideration of depreciation.  However, it was noted that there likely would be sufficient cash flow to make the debt payments, including payments on the amounts owed the Bertschs unless unanticipated maintenance expenses would necessitate a postponement in the amount of the periodic payments to the Bertschs.

b.      A number of project matters were discussed relating to easements at Cocoa Beach and making payment on unpaid bills and resolving disputed liens for the Mora project.

c.      There was a discussion about the fact that part of the additional costs incurred at Cocoa Beach would be reimbursed over time by the USPS through higher lease payments, rather than immediate reimbursement, along with an explanation as to why   receiving higher lease payments was more favorable to Eagle Eye than immediate reimbursement.

d.    The fact that, once the easements at Cocoa Beach and the final bills for the Mora project were resolved, Eagle Eye should be able to operate with minimal management and expense.  Essentially, the previously negotiated arrangement with Bertsch Construction to provide post-construction project management was recognized and implicitly approved.  Although not all of the specifics of the earlier written contract were discussed in the minutes, the fact that Eagle Eye would be reimbursed for its costs from and after February 16, 1998, was mentioned.  Further, it was stated that the hourly charges for the accounting and secretarial service would be billed at $30.00 and $15.00 per hour, respectively.  Finally, it was indicated that Bertsch's time would not be charged so long as it did not become excessive, meaning more than 10 hours a month.

e.    There was a discussion about what financial reports would be prepared on a going-forward basis.

f.    The need to obtain a line of credit to even out the cash flow in order to timely pay the real estate taxes on the three projects.

g.    There was a discussion about the payables still owed to the Bertschs and the fact that these payables would bear interest at 10%, except for the amounts secured by the real estate mortgage on the Bertschs' residence which was less then 10%.  It was also decided that it would be in the Bertschs' discretion as to how the payables to them would be paid from the rental proceeds and whether any rental proceeds would be paid to Roemmich prior to the payables to the Bertschs being repaid.

42.     Roemmich contends that he did not receive notice of the annual meeting that was held on February 23, 1998.  However, the corporate records indicate that a notice was sent on February 4, 1998, in Roemmich's name to 2413 Astronaut Drive, Bismarck, ND 58501, which is the address of his mother.  Prior to this time, the defendants had been sending notices and letters to Roemmich at his Billings, Montana address, to which he had returned sometime in 1996 after he left the Florida projects.

Bertsch testified his recollection was that they had been instructed by Roemmich to send information directed to him to his mother's address and that this was the reason why the notice was sent to that location.  Further, there is other evidence that indicates that Roemmich was receiving his mail at the Bismarck address during this same time frame.  For example, on April 3, 1998, Roemmich wrote a letter to the Bank of Glen Ullin alleging legal difficulties at Eagle Eye and claiming improper use of Eagle Eye money.  The inside address that Roemmich used was the Bismarck address for his mother.

And, even earlier, Bertsch wrote to Roemmich on March 23, 1998, at the Bismarck address responding to questions that Roemmich was posing to Eagle Eye's attorney with respect to the prior year-end statements and reimbursables.  Bertsch requested in his letter that Roemmich put his questions in writing and that a response would be prepared.  He further requested that Roemmich provide a  written authorization to send the material to Roemmich at his mother's address.  It appears Roemmich received this letter because later in June 1998 Roemmich provided the requested written authorization.  Further, in the written authorization, Roemmich stated that he had previously given verbal directions to both Wagner and Bertsch to send mail to the Bismarck address.

26

There is no good reason for the defendants to have suddenly stopped sending letters and notices to Roemmich's Billings address and to start sending them to the Bismarck address unless they had been advised orally by Roemmich to do so.  This, coupled with proof that Roemmich was using his mother's address about that time and his own written reference in the June 1998 authorization that he had earlier communicated his desire to both Bertsch and Wagner orally that material be sent to that address, leads the court to find that Roemmich did advise Bertsch and/or Wagner prior to the notice being given for the February 13, 1998, annual meeting that information should be sent to that address.  The court further finds that notice of the meeting was sent to Roemmich at the Bismarck address on February 4, 1998, as indicated by the corporate records, and that Roemmich should be charged with having received notice of the meeting, whether he actually received it or not.

43.     Roemmich continued making requests for information, accusations of fraud, and contacting Eagle Eye's bankers in 1998.  Specifically, he had several contacts with Eagle Eye's attorney David Tschider regarding these subjects and threatened at one point to contact the U.S. Attorney's office.  Finally, in June 1998, Bertsch terminated Tschider because he no longer wanted to pay the legal bills he was getting as a result of Roemmich's numerous contacts with Tschider.  When he did so, Roemmich was advised that he should communicate directly with Wagner or Bertsch if he had any questions.

44.     Although Roemmich made numerous allegations of illegal and criminal conduct, both orally and in writing, and threatened at various times to contact the law enforcement authorities, there is no evidence he actually contacted any law enforcement authorities and his conduct bordered upon being extortionate.

45.     A special meeting of the board of governors was held on March 9, 1999, to move the working capital loan from the Bank of Glen Ullin to the Union State Bank of Fargo.  At the same time, the board of governors increased the size of the loan to retire approximately $181,334 of the payables owed the Bertschs, leaving approximately $49,831 unpaid.

46.     At some point, Bertsch instructed Wagner to send Roemmich only the K-1's and not any of the more detailed financial information that previously had been forwarded to Roemmich on a routine basis.  Bertsch's concern was with what Roemmich might do with the information.  While Bertsch's visceral reaction at that particular point, perhaps, is understandable given the nature of the allegations being made by Roemmich, it was an overreaction in the longer-term.  The court finds it was unreasonable not to voluntarily provide a 30% owner of a close company, such as this, with at least the income statements, balance sheets, general ledger information, and tax returns on a yearly basis, even though legally Roemmich had the right under North Dakota law to demand the information and there is no evidence that he ever made such a demand.  Further, early corporate practice established a legitimate expectation on Roemmich's part that he would be provided with this information.  On the other hand, there is no evidence that any of the defendants ever refused to provide Roemmich with information when he specifically requested it, nor is there any evidence that he was at any time denied access to Eagle Eye's books.  In fact, the evidence is to the contrary in both respects.

Roemmich presented evidence that Bertsch instructed one or more of the bankers not to provide Roemmich with information when Roemmich began calling and writing the bankers alleging improprieties and raising legal concerns.  Given the allegations being made and a legitimate concern the bankers might become spooked and not want to do business with Eagle Eye, Bertsch's actions

28

were reasonable under the circumstances, particularly given the offers that Roemmich obtain the information directly from Bertsch and Wagner and that he inspect Eagle Eye's records.

47.      Eagle Eye has consistently made progress in reducing the principal amount of its indebtedness, as illustrated by a comparison of the amounts outstanding on the various loans as of the refinancing in 1999 (excluding accruals for interest payable) with the amounts outstanding as of  2004, the last year for which figures were presented as evidence:

|  | 1999 | 2004 |
|---|---|---|
| Mortgage - Cocoa Beach | $950,651 | $852,589 |
| Mortgage - Mims | $669,832 | $600,738 |
| Mortgage - Mora | $394,426 | $328,169 |
| Union State Bank | $294,365 | $227,429 |
| Bertsch Note | $46,217 | $13,062 |
| Totals | $2,355,491 | $2,021,987 |

There is no evidence that Eagle Eye has been mismanaged, and Roemmich's 30% share has continued to increase in value - assuming there has been no significant decline in real estate values. Further, in obtaining the permanent financing, Bertsch was required to personally guarantee the repair and maintenance on the projects on a going-forward basis and Roemmich was not required to participate in the personal guarantee.

**Compliance with corporate formalities and lack of any member and board of governors meetings for almost seven years**

48.      Beginning in 1996, Eagle Eye's documentation of corporate decision-making has been somewhat irregular and there is apparently no formal documentation since the last board of governors meeting in 1999.  Several of the issues raised in this case likely could have been avoided, or at least more easily resolved, if there had been better documentation.

49.      There has not been a meeting of the members since February 1998, and there has not been a formal meeting of the board of governors since March of 1999.  In fact, the last documented

formal action of Eagle Eye is the board-of-governors meeting that was held on March 9, 1999. While Jane Bertsch has signed off on documents when required and has attended board of governors meetings, she has deferred to her husband in terms of all decision-making and has not been actively involved in the management of the company.  In fact, she could not recall at trial that she was the treasurer of Eagle Eye and Bertsch could not recall when litigation was commenced who replaced Roemmich as the second governor.

50.    It appears that all of the necessary permanent financing, plans for loan repayments, and post-construction operating arrangements were in place as of the date of the last board-of-governors meeting.  And, since the last board of governors meeting, the primary activity of the corporation has been to collect rents, pay bills, file tax returns, perform necessary maintenance and repairs, all of which is within Bertsch's authority as chief manager of Eagle Eye. This is some explanation for why there has not been a need for regular meetings of the either the members or the board of governors.

51.    Neither North Dakota law nor Eagle Eye's organizing documents require annual meetings of the members or even regular meetings of the board of governors.  As discussed later herein, Roemmich has the right  under North Dakota law and Eagle Eye's Operating Agreement to call regular and special member meetings, but he has never exercised this right.

**Evidence of alleged fraud with respect to the change orders submitted to the USPS**

52.    The court previously ruled that any claim for affirmative relief arising out of allegedly fraudulent change orders being submitted to the USPS was barred by the statute of limitations.  In its ruling, the court indicated, however, that it might allow evidence related to this subject to be presented for some other purpose, and  Roemmich did offer such evidence claiming

it was relevant to justify why he left the Florida projects before they were finished and later took the actions that he did in writing letters to the defendants, banks, and other individuals claiming that fraud and unlawful conduct had occurred.

53.    The substantial passage of time, however, made sorting out what happened ten years ago with respect to the change orders virtually impossible.  This is clearly illustrated by one of the principal items of evidence offered by Roemmich in support of his claims of fraud:  a letter from contractor Don Haynes claiming an entitlement to  $7,500, purportedly for extra administrative time and effort required on the Cocoa Beach Project as a result of the USPS's project changes.

The inferences that Roemmich wants the court to draw from Haynes's deposition testimony is that the Haynes letter was fabricated by either Bertsch or Wagner because Haynes did not recall preparing the letter, or agreeing to its preparation, and that it was also fraudulent because Haynes claimed he did not receive any of the $7,500.   However, Haynes clearly had problems recalling what  had actually taken place some ten years prior and was equivocal regarding his involvement with the letter.  Further, it appears his testimony was colored by a later disagreement he had with Bertsch.  Finally, Haynes did sign a lien release agreeing that he had been fully paid for his work, and it does not necessarily follow that simply because Eagle Eye may have received money on this part of the claim that it would all have to go to Haynes.

54.    Upon review of the Haynes testimony and the other evidence submitted by Roemmich with respect to his claims of fraud, the most the court can discern is that the attempts by Bertsch and Wagner to document Eagle Eye's claims for additional compensation from the USPS, which for the most part appear to have been meritorious, required a fair amount of estimation and,

31

at times, may have been less than perfect and included some mistakes.  However, in what was presented to the court, there is no clear evidence of fraud.[3]

Further, it appears that Roemmich lacks an appreciation for the difficulty of developing, after-the-fact, the necessary support for Eagle Eye's claims, given the nature and timing of the changes made by the USPS and what little data Eagle Eye had to work with to cost out the changes, and also a lack of appreciation of what factors the USPS deemed relevant in approving the changes. Moreover, it appears the claims process was made more difficult because Roemmich had left and, at that point, Bertsch and Wagner did not have the same familiarity with respect to the project details as Roemmich.  The court finds credible Bertsch's testimony that they were left with a mess when Roemmich departed in terms of trying to process the necessary change orders.

Finally, the claims submitted by Bertsch on behalf of Eagle Eye were reviewed on behalf of the USPS by an architect and the USPS's project manager, both of whom had substantial construction experience.  And, after that review, the parties spent two days in Atlanta, Georgia negotiating the claims.  The end result of all of this was that the USPS professionals accepted parts of the claims and rejected others, but made no claims of fraud or improper conduct on the part of Bertsch or Eagle Eye.  They appear to have clearly understood that estimates had been made and that there was a certain amount of imprecision with respect to Eagle Eye's claims.

---

[3]  This is not to say, however, that the Haynes letter raised no questions, and the court's ruling that there is not sufficient proof of fraud should not be taken as an endorsement of what may have occurred.  If it was true that Haynes was not personally involved in the administrative activities for which the expense was being claimed, the letter should have more clearly spelled this out and indicated that what was being presented was an estimate by someone with familiarity with the project as to efforts undertaken by others.  Also, while there is not sufficient proof before the court to determine one way or the other, it may be that part of the extra administrative effort being claimed was undertaken by Roemmich, who was no longer available to provide the necessary estimate, and, since Haynes had been working on the project and later replaced Roemmich in terms of providing some of the on-site supervision, he was in the best position to make the estimate.  In any event, the court is not prepared to find fraud based on gruel as thin as the Haynes letter.

55.   In summary, the evidence offered by Roemmich is insufficient to prove fraud with respect to the change orders on the USPS projects.  Moreover, even if fraudulent conduct had occurred, it would be virtually impossible now to reach that conclusion with any degree of confidence because of the passage of time.  Roemmich should have acted long ago if he believed fraud had actually occurred, and his failure to do so means he must live with the consequences in terms of the court's consideration of the equitable factors in this case.

**Claim of self-dealing relating to disbursement of $177,770.05 lump sum settlement**

56.   After negotiations were completed with the USPS with respect to the cost overruns on the Cocoa Beach project, Eagle Eye received $152,247.55 from the USPS in early April 1997.  As soon as the money was received, it was immediately disbursed to pay accumulated project costs, with most of the money (approximately $140,000) being paid to accounts payable to Bertsch Construction for loans and advances made for the projects.

57.   Roemmich argues that this disbursement of money, primarily to Bertsch Construction, amounted to self-dealing because the money could have been used for other purposes, including holding some or all of the money for use as working capital, possible distributions to owners, payments to other creditors, or using the money to decrease the 6% fee paid on the permanent financing.   He also claims that not all of the reimbursed expenses have been verified as being legitimate expenses of Eagle Eye and that an accounting is required to verify the legitimacy of the expenditures.

58.   Defendants' expert accountant and her staff, conducted a review, albeit somewhat limited, of the invoices that were submitted by Bertsch Construction to Eagle Eye and did not unearth any apparent irregularities or fraudulent activity.  Also, Bertsch and Wagner testified as to

the accounting practices that were followed and stated that the charges by Bertsch Construction were for legitimate project expenses. Further, the evidence indicates that Wagner was meticulous in terms of his record keeping even though he occasionally made errors in terms of accounting theory.

Based on this and the other evidence, the court finds that the vast majority, if not all, of the costs that were reimbursed were legitimate. Further, the court also finds that the cost of attempting now, at this late date, to verify the legitimacy of all of the expenses would likely exceed the amount of any possible errors, particularly given the fact that no obvious or large errors have been uncovered by either parties' accounting experts.

The amounts owed to Bertsch Construction in April 1998, needed to be repaid at some point, along with appropriate interest. Further, given the expectations of the parties that the projects would essentially finance themselves, it is unreasonable for Roemmich to expect that Bertsch, through his related entity of Bertsch Construction, should have been required to carry the costs for the projects any longer than necessary, or on terms less favorable than the interim financing obtained for the projects. Also, Roemmich's only personal liability on the three projects, which was the loan he had guaranteed and secured with a mortgage on his residence, was repaid in full during the same time frame when the permanent financing became available. Consequently, the court finds that the immediate reimbursement of Bertsch Construction was reasonable under the circumstances and that Roemmich was not unfairly prejudiced.

59.     Roemmich claims he did not know as of April 13, 1998, nor should he be charged with having known, that Eagle Eye received the $152,247.55 payment from the USPS in April 1997 and immediately disbursed the bulk of the money to Bertsch Construction. Roemmich claims that a person would need to have reviewed the detailed accounting, together with the Eagle Eye's

34

checkbook, to figure out where the money went, and there is no evidence that any of this information was sent to him on or before April 13, 1998, much less in sufficient time for him to have analyzed the information prior to that date.  In particular, he claims that Bertsch affirmatively prevented him from uncovering this information because he instructed Wagner to stop sending him the detailed accounting information.

The credible evidence is that Roemmich knew, or should have known, well before April 13, 1998, that Bertsch Construction was involved in the projects and that money was being paid to Bertsch Construction.  In fact, he was specifically advised at the May 1997 annual meeting of what had been paid.  Bertsch did instruct Wagner to limit the amount of  information he was sending to Roemmich because of the charges that Roemmich was making to third parties.  However, the evidence indicates that every time Roemmich requested particular information he was provided it and that the defendants offered Roemmich and  his attorney the opportunity to inspect the books and records of Eagle Eye on more than one occasion during this time frame.   Further, it was during the time frame of late 1996 and 1997 that Roemmich was writing to third parties accusing Bertsch of fraud with respect to payments and project charges.  Based on this, Roemmich knew or should have known about the change-order compensation and its disbursement to Bertsch Construction before April 13, 1998.  Consequently, any claim of self-dealing in terms of paying Bertsch Construction, instead of the money being used for some other purpose, accrued prior to April 13, 1998.

Likewise, the same is true with respect to the claim for an accounting.  Considering that Roemmich was making claims of fraud as early as the latter half of 1996 in terms of costs that were being submitted to the government, he obviously had sufficient notice of any potential claim of

35

illegitimacy of the expenses, such that any claim for an accounting accrued prior to April 13, 1998.

**Claim of self-dealing in paying Bertsch Construction 3% of project costs**

60.     Another allegation of self-dealing by Roemmich has to do with the eventual payment of approximately 3% of the project costs for the three post offices to Bertsch Construction to compensate Bertsch Construction for the accounting and secretarial services it provided along with other office overhead.

When the Florida projects were bid, which was before Roemmich became involved, Bertsch contemplated that Bertsch Construction would provide the support services for the construction and development of the projects and included in his bid amounts for reimbursement to Bertsch Construction on a percentage basis.  Bertsch also contemplated that the projects would eventually be folded into a special purpose entity for ownership purposes, which in this case became Eagle Eye.

Essentially, Eagle Eye is nothing more than a holding company, and it was never contemplated that it would hire all of the personnel needed to perform the work required for managing the development and construction of the projects, including performance of the necessary accounting and secretarial work.  Nor was it contemplated that Eagle Eye would acquire the necessary equipment, *e.g.*, computers and software, to do the management work.  Given the short period of time required for the development and construction of the projects, it was reasonable to contract for this support service.  Further, using Bertsch Construction to provide the necessary support service was also reasonable, provided that the terms were fair to Eagle Eye, given its relationship to the majority-interest member, the experience and availability of its personnel, and its familiarity with the projects.

36

61.     Charging a percentage fee based upon projects costs (in lieu of hourly charges for personnel, rental charges for equipment, and a percentage markup for profit and overhead) is a reasonable and an accepted method of providing compensation for project support services.   In terms of the percentage fee that would be reasonable in this case, the credible evidence indicates, among other things, the following:

a.      In the past, Bertsch Construction had charged 5% of total project costs, exclusive of land costs, to related Bertsch entities on other projects for construction support services.  What was not clear from the testimony was whether this 5% included professional management (*i.e.*, the time spent by Bertsch himself) or was limited to reimbursement for overhead items, such as bookkeeping, secretarial support, equipment use, and other like expenses.

b.      Defendant's expert Diana Kindseth, who has substantial construction accounting experience, testified that the amount actually charged in this case was very conservative and that, in her experience, percentages of 5% to 10% of projects costs for project management fees would not be uncommon.

c.      USPS allowed a 20% profit and overhead factor upon the change order work at the Cocoa Beach project.  Likewise, plaintiff's own accounting expert acknowledged that charges of 10% for overhead and 10% for profit (commonly referred to as "ten & ten") are quite common in the construction industry, particularly for smaller amounts of work.   While this is a somewhat of a different reimbursement arrangement, it does have relevance regarding the relative magnitude of the overhead fees charged to the projects.

37

62.     The amount ultimately paid to Bertsch Construction as a construction overhead fee was $72,433.61, which was approximately 3% of the total project costs of $2,470,599.98, including land costs of $433,596.28.  There was evidence that Bertsch Construction had not included land costs in the calculation of project supervision fees when it provided similar services to Bertsch entities on other projects, but the evidence also was that, in those cases, the percentage fee charged was 5% of the total projects costs, exclusive of the land costs.  In this case, if Bertsch Construction had charged 5% of the total project costs less the land costs (the difference amounting to $2,037,003), the total fee would have been approximately $101,550, or approximately $30,000 more than what was charged - at least to reimburse for project overhead items.

63.     The court finds that the 3% fee charged by Bertsch Construction for overhead reimbursement was reasonable given the accounting, secretarial service, equipment use, and other office overhead costs that the post office projects reasonably would have needed over the time period involved - which was more than two years.  Roemmich cannot reasonably expect that these services would be provided free, particularly when the services assisted in enhancing the value of his 30% interest.

64.     There is no evidence that the 3% management fee was ever formally approved by Eagle Eye's board of governors or the members.  However, the involvement of Bertsch Construction, as well as the expectation that Bertsch Construction would be compensated for its service, predated the creation of Eagle Eye.  When the projects were folded into Eagle Eye, the obligation to pay Bertsch Construction at least reasonable compensation for the services it performed came with it.  Further, payment of the management fee was within Bertsch's authority as chief manager.

65.     As previously noted, Roemmich questioned Eagle Eye's attorney in late 1996 regarding certain charges that appeared in financial information that had been provided to him through October 31, 1996, and was advised in a letter from Eagle Eye's attorney dated December 5, 1996, that these charges were accruals for a 3% fee payable to Bertsch Construction.  Also, the credible evidence is that Roemmich was again advised at the May 17, 1997, annual meeting that a 3% overhead fee had been paid by Eagle Eye to Bertsch Construction.  Either one of these two things was sufficient to put a reasonable person in Roemmich's position on notice of any potential claim with respect to the overhead fees that had been paid.  As a consequence, any cause of action that Roemmich had with respect to the payment of the 3% overhead fee paid to Bertsch Construction accrued well before April 13, 1998.

**Claim of self-dealing re compensation paid to Bertsch**

66.     Roemmich claims as self-dealing the $400 per week that ultimately was paid to Bertsch as compensation for his work during the development and construction of the projects.  He claims that the payment was (a) not authorized, (b) contrary to an alleged agreement between he and Bertsch that neither would take money out of the corporation during the development phase, except for the salary that was to be paid Roemmich while he was working on the projects; and (c) unreasonable and amounted to a "double dip" given the payments made to Bertsch Construction. As further evidence of alleged self-dealing, Roemmich points to the timing of the payment, *i.e.*, the fact the money was paid retroactively and not until after Roemmich had left the projects.

67.     The $400 per week compensation was not paid contemporaneously as the services were performed.  However, when it was clear that sufficient money would be available with the permanent financing, Bertsch instructed Wagner to book a retroactive charge of $400 per week as

compensation for his services so that the costs could be capitalized for accounting purposes as part of the total project costs.  The total amount paid was $41,600, and was intended to cover the time period from April 3, 1995, through April, 1997, a total of 104 weeks.

68.     The credible evidence is that  Bertsch's decision to finally take compensation for his services, even though he was initially inclined not to do so, was the combined result of the additional work he had to perform, because of Roemmich leaving and the unanticipated problems that arose with the projects, and his belief that Roemmich should not get the benefit of his substantial efforts for nothing in view of Roemmich leaving the projects in Florida in an uncompleted state and then doing everything he could to make Bertsch's life difficult, including making allegations of criminal misconduct to the banks and the government.  In terms of the equitable considerations, Bertsch's desire that he should be fully compensated for the services performed for the benefit of Eagle Eye (including  Roemmich and his 30% interest) are understandable, and in this case, the court finds to be equitable, given the circumstances.  Consequently, Roemmich was not unfairly prejudiced by the compensation paid to Bertsch provided the compensation was reasonable in terms of the work and services provided.

69.     Part of the work performed by Bertsch was project supervision and there is some question whether he was performing this work as an officer of Eagle Eye or as the principal of Bertsch Construction.  The evidence in this case supports a finding that it was the former, and not the latter, including the evidence indicating that the 3% fee paid to Bertsch Construction was only for overhead support and did not include professional management in terms of Bertsch's time.  This evidence includes the fact that the fee likely would have been a higher percentage had it included professional management and the fact that some of the project management, including Roemmich's

40

time, was being paid by Eagle Eye and not Bertsch Construction.  Or, to put it somewhat differently, if the amount paid to Bertsch is added to the management fee paid to Bertsch Construction, the combined amount represents 5.6% of the total projects costs, exclusive of land costs, which would not be an unreasonable amount solely for project management services based on the defendants' expert's testimony that fees in the range of 5% to 10% are not uncommon for this type of service and also is close to what Bertsch Construction had charged other Bertsch related entities on other projects.

Bertsch, however, also performed work that was not project supervision (and that would not have been covered by any fee charged by Bertsch Construction even if the fee included professional management and not just support services),  including managing Eagle Eye as its chief manager, preparing the bids on the three projects, and arranging for the construction and permanent financing.  Also, some of the work involving the negotiation of the change orders with the USPS was both an officer/ownership function and a project management function.  The fact that Bertsch was wearing "two hats" is a point that was made by the defendants' expert accountant when she was asked whether she believed the compensation paid to Bertsch was a "double dip" given the fee that had also been paid to Bertsch Construction.

The court concludes that the $400 per week paid for the work and services performed by Bertsch was not a "double dip" and would have been a reasonable amount for either his project management or his Eagle Eye management, given his expertise and the nature of the work performed.

70.    There is no evidence that the $400 per week compensation was approved by the Eagle Eye board of governors or its members.  Further, in contrast to the obligation to reimburse

Bertsch Construction for its services, this was an obligation undertaken after Eagle Eye was created.

The failure to obtain either member or board of governors approval was not a violation of North Dakota law in that it was within Bertsch's authority as chief manager to authorize such a payment given the broad authority permitted persons designated chief managers under North Dakota's Limited Liability Company Act.  It was, however, a violation of Eagle Eye's Operating Agreement, which, required board of governors' approval for compensation paid to governors (section 2.15) and managers (section 3.09).

71.     Based on the credible evidence, Roemmich was advised at the May 17, 1997, annual meeting in response to a question posed by him that Bertsch had been paid $400 per week as compensation for his services.  This was sufficient to put a reasonable person in Roemmich's position on notice of a potential claim if there was a concern that the compensation was unauthorized or excessive.  As a consequence, any cause of action that Roemmich had with respect to the payment of the $400 per week compensation to Bertsch during the development of the projects accrued well before April 13, 1998.

**Claims of self-dealing re the post-construction management agreement with Bertsch Construction and the hurricane repair work**

72.     Roemmich claims as self-dealing the fact that Eagle Eye entered into a management agreement with Bertsch Construction for the post-construction management of the post office facilities.  Some of the details regarding that agreement have previously been discussed.  Also, related to this claim are Roemmich's complaints about the fact that Bertsch Construction sent its own crew to Florida to do repair work on the Florida facilities after a series of hurricanes damaged the facilities.  Roemmich contends this work could have been done more cheaply using local

contractors, possibly with Roemmich providing supervision. Roemmich contends that the reason Bertsch Construction did the work was so that Bertsch could bleed more money out of Eagle Eye to Roemmich's disadvantage.

73.     After the three post office projects were completed, the evidence indicates that the amount of management and supervision required to sustain the projects and Eagle Eye was substantially reduced and would not justify the employment of full-time personnel.  Consequently, contracting with someone capable of providing, on a part-time basis, real estate management, repairs (or the ability to oversee repair work), and accounting services would be the most cost-effective solution.   In this case, Bertsch Construction was capable of providing all of these services and had the advantage of having familiarity with the projects.  For these reasons, the court finds that the decision to contract with Bertsch Construction for project management on a going-forward basis was a reasonable one assuming that Eagle Eye is not being financially disadvantaged.

74.     The terms of the  project management contract with Bertsch Construction are that it will provide the necessary project supervision, management, and accounting services as needed on a time-and-material basis with a markup of 10% profit and 10% overhead.  Also, hourly rates have been established for time charged by Bertsch Construction personnel, as detailed earlier herein, at least for accounting and secretarial time.

75.     The court finds that the hourly rates being charged by Bertsch Construction personnel for accounting and secretarial services are reasonable and rejects the claim that the time charges have been excessive in particular instances for accounting and secretarial service.   In fact, the evidence is that Bertsch is not charging his time unless it amounts to more than ten hours per month,

and no claim has been made that the amounts that have actually been charged by Bertsch, if any, to date have been excessive either in time or amount.

Plaintiff claims, in particular, that the "ten and ten" markup by Bertsch Construction for profit and overhead is unwarranted and excessive. However, the expert accountants for both parties acknowledged that a markup of "ten & ten" for profit and overhead is quite common for contracted work, particularly work that is piecemeal and smaller in scope. Also, another indication of the reasonableness of this markup is the fact the USPS permitted a "ten & ten" markup on the change-order work at the Cocoa Beach project. The court finds that the mark up of "ten and ten" is appropriate and not unreasonable.

Roemmich also complains about the fact that the "ten and ten" burden has been imposed on minor costs, such as the repair of an air conditioner, and also on travel costs. However, Roemmich fails to realize that the fixed percentage markup on actual services provided is simply one method of attempting to recover overhead costs and earn a reasonable profit and that, in the case of the overhead component, is in lieu of attempting to calculate actual overhead amounts. Further, the markup is only applied when services are actually rendered, and there is an actual cost in having employees, equipment, and office space available for use on a continuous basis. Consequently, once the markup is established and is deemed reasonable, there is nothing inappropriate about applying it on a consistent basis to all legitimate expenses and costs, because this is the only way reimbursement for overhead and profit can be recovered.

76.   With respect to the hurricane damage, Bertsch testified that the reason he used Bertsch Construction was because he had trouble finding anyone locally to do the work in a timely manner given the amount of construction activity of the same type that was going on in Florida in

the wake of the hurricanes and the fact the USPS was pressing to get the repair work completed. The court finds that the explanations offered by Bertsch are credible as to the reasons why local contractors were not utilized and why it was necessary to use Bertsch Construction employees. The evidence also indicates that the Bertsch Construction personnel did the work at favorable labor rates, which to some extent offset the costs of the travel. Given the circumstances, Roemmich was not unfairly prejudiced by this action.

77.     There is no evidence that the members or the board of governors approved the management agreement or the use of Bertsch Construction personnel to perform the repairs to the hurricane damage instead of using local contractors. However, these were decisions that were within the scope of Bertsch's authority as the chief manager of Eagle Eye.

78.     The court finds that Roemmich should have known of the arrangements made with Bertsch Construction for post-construction management of Eagle Eye, which were first made in January 1997, given the fact that he was given notice of the February 1998 annual member meeting at which the arrangements were further discussed and refined. The court finds that any claim regarding post-construction management activity on the part of Bertsch Construction accrued prior to April 13, 1998, for any management activity taking place before that date.

However, the agreement with Bertsch Construction was not for a fixed term and can be terminated at any time. Consequently, what did not accrue prior to April 13, 1998, is any claim regarding the management activity of Bertsch Construction after that date, including the hurricane-damage repair which did not take place until 2004.

**Claims of self-dealing with respect to loans made by the Bertschs**

79.     Roemmich claims that Bertsch has engaged in self-dealing with respect to certain payables that the Bertschs claimed were owed to them for money they put into Eagle Eye when the original construction financing proved to be inadequate.  One of Roemmich's complaints is that it has not been demonstrated that all of the money claimed by the Bertschs actually found its way into Eagle Eye.  However, after extensive investigation, Roemmich's own accountant acknowledged he could find no evidence that the Bertsch payables were fraudulent.  This also was the conclusion of defendants' expert accountant.  Finally, Bertsch and Wagner testified that the money being claimed actually went into Eagle Eye, which testimony the court finds to be credible.

The court finds that the Bertsch payables  were cash infusions made by the Bertschs to keep the projects alive after problems developed with both the Cocoa Beach and the Mora projects and that, for reasons already covered, the Bertchs were not obligated to make  the loans.  Further, it is also apparent that one or more of the projects would not have been completed, or would have been completed at significant additional expense, if the Bertschs had not made the cash infusions and that the value of Roemmich's 30% interest was preserved by the Bertschs borrowing of the money to Eagle Eye.  Finally, the credible evidence is that the Bertschs put themselves at considerable financial risk when they advanced the money and that the financial pressures felt by the Bertschs were considerable until the projects were completed, new lease arrangements with the USPS were negotiated, and the long-term financing was successfully obtained.

80.     Roemmich also claims self-dealing with respect to the interest rates that were applied to the Bertsch payables.  The evidence indicates, however, that the interest rates assigned to the loans were reasonable and in line with the rates being charged during the same time frame by

commercial lenders for slightly higher-quality loans, as evidenced by the rates charged BNC on the loans the Bertschs and Roemmich took out in order to advance the money to Eagle Eye, which, for the most part, were secured, while the Bertsch payables were not.  In terms of the amounts that remained unpaid post-construction, it appears that a substantial amount of the Bertsch payables, but not all, were retired as soon as practicable with refinancing at a slightly lower rate.  As to the relatively small amount that remained, the rate charged does not appear to be excessive considering it is unsecured, is being retired as money becomes available, and allows Eagle Eye some flexibility in terms of postponing repayment in the event extraordinary maintenance or repair items should arise in any particular year.

81.     Finally, Roemmich claims as self-dealing the fact that repayment of money loaned by the Bertschs has been given precedence over other uses for the money, including making periodic distributions to the members.  However, as previously noted, it was the expectation of the parties that the projects would essentially finance themselves.  In fact, Roemmich complains about the fact that he was forced to guarantee a loan for which he never actually had to make payments, and the loan he made was among the first to be repaid.

The court finds that repayment of the loans made by the Bertschs prior to the money being used for other purposes, including making any distributions to members, is in keeping with the original expectations of the parties and has been equitable.  Further, the court finds that repayment as soon as practicable is reasonable, so long as there is sufficient money or lines of credit available to meet operating expenses.  At this point, there is no evidence that the repayments to date have caused Eagle Eye any financial problems.

82.     Roemmich knew, or should have known, prior to April 13, 1998, of the principal amounts of the payables that have been claimed by the Bertschs; hence, any claim contesting the principal amounts accrued prior to that date.  In fact, the credible evidence is that these payables were discussed at the May 1997 member meeting and were questioned by Roemmich.  Further, the payables were again discussed at the February 1998 meeting of which the court finds Roemmich had notice of and did not attend.  What did not accrue as of April 13, 1998, however, is any claim with respect to the amount of interest being charged after that date or any preferences given to repayment of the principal amounts and the interest from and after that date.

**Claims of self-dealing re co-mingling of funds**

83.     Roemmich claims that there was an improper co-mingling of funds.  In that regard, there was some evidence that Eagle Eye made payments for non-Eagle Eye obligations on behalf of Bertsch during construction.  However, in each instance, the payments were credited against the payables owed the Bertschs.  This includes the checks written to C. Schmidt Construction and to RB Building.  Overall, the amount of these payments was relatively insignificant and there is no evidence that Roemmich was unfairly prejudiced by these payments since at the time the payments were made money was owed to the Bertschs.  Also, there were a couple of instances in which Roemmich obtained money or benefits from the company in small amounts that were not entirely proper.

**Claims of freeze-out and other violations of Roemmich's minority rights**

84.     Roemmich claims that he has been frozen-out from any economic benefit from his 30% interest given the fact that he is not receiving annual income either in the form of employment or distributions of company income, while, according to Roemmich, Bertsch has been taking money

out in the form of compensation to himself and Bertsch Construction during construction and development, payments to Bertsch Construction for post-construction management, and payments on the Bertsch payables.

Roemmich, however, had no reasonable expectation of long-term employment and he voluntarily terminated his short-term employment on the Florida projects.  Further, Roemmich has no reasonable expectation of any significant distributions until there is a substantial change in the financial picture of Eagle Eye, such as the USPS exercising one of its purchase options.  Roemmich understood from the beginning that the post office projects were a long-term investment for which there likely would be no significant distributions for years.  The only exception is Section 3.04 of the Membership Control Agreement that provides for yearly distributions to members to assist them in paying their share of the tax liability fo the company.  However, the only evidence presented to the court is that there were tax losses in the early years with the possibility that there may be small operating profits later on, and no evidence was presented as to whether in the last several years, for example, there has been sufficient monies to make distributions for tax purposes.

In terms of Roemmich's complaints that Bertsch is taking money out of Eagle Eye indirectly, the court has already concluded that the preferences given to payment of the Bertsch payables has been reasonable and within the original expectation of the parties.  With respect to the current arrangements with Bertsch Construction, the court has concluded that the overall terms are reasonable and that there is no evidence that the particular amounts paid to date have been either excessive or unreasonable, including the hurricane-damage repair.   Finally, the other payments to Bertsch and Bertsch construction that have been discussed have been found to be reasonable.  In

summary, there is no evidence that Roemmich has been frozen-out of his 30% interest.  In fact, the evidence is that the value of his long-term investment has been enhanced and preserved.

85.    Roemmich claims that he has been squeezed-out from participating in the active management of Eagle Eye, that he is not being provided notices of meetings and routine financial information, and that there have not been any regular meetings of the members or the board of governors.  Roemmich also points to the fact that he was terminated as a governor in 1996 and the failure to reappoint him as a governor since that date.

The court has already concluded that any claim for affirmative relief resulting from Roemmich being terminated as a governor in 1996 is time-barred.  However, with respect to the claim of squeeze-out from active participation in the management of Eagle Eye generally, including any failure to reappoint Roemmich as a governor, the court finds that he has forfeited any right or expectation to active participation in the management on account of his own inequitable conduct and breaches the fiduciary duty to act in a fair, honest and reasonable manner.  The specific acts upon which the court relies are detailed later in a discussion of the court's conclusions.

Roemmich argues that his claims of fraud and unlawful conduct were justified and that he was merely acting in the best interests of Eagle Eye.  However, for the reasons already stated, the court has found Roemmich's proof of fraud to be insufficient.

86.    Roemmich did not attend the scheduled member meetings in 1996 and 1998, either in person or by proxy, despite having been given notice.  Further, he has not exercised his rights under section 1.04 of Eagle Eye's Operating Agreement or North Dakota law to request a meeting of the members as previously noted.

50

87.     In terms of Roemmich's claims that he has not been provided notices of all of the meetings, he would not normally be entitled to notices of board of governors meetings after he was removed as a governor.  And, the court has already concluded that Roemmich was given notice of the member meetings in 1996 and 1998 that he did not attend and that he attended member meetings held in 1995 and 1997.  There have been no other member meetings.

88.     With respect to Roemmich's claim that he has not been provided with copies of all the information that he claims should be sent to him, the court finds that Bertsch's reluctance to send information without a specific demand being made was somewhat understandable in view of Roemmich's conduct, but is unreasonable to the extent that Roemmich has not routinely been sent even the basic financial information, such as the balance sheets and income statements.  The court also finds, however, that Roemmich has not been denied any information or access to Eagle Eye's records when a specific request has been made.  In fact, as previously detailed, the evidence is that Roemmich was provided information and access to the records when he specifically requested it.

.    89.     While the amount of activity since 1998 in terms of necessary decision-making has been substantially reduced from what had taken place earlier, decisions have been made since the last member meeting in February 1998 and are continuing to be made (or possibly not made) that are of interest to Roemmich as a 30% owner, including:  the refinancing of a portion of the long-term debt in 1999;  the hurricane-damage repair in 2004; the financial planning (or lack of it) with respect to the handling and payment of future repairs and maintenance; insuring that sufficient levels of insurance are being maintained on the project property with respect to both casualty and liability; consideration of opportunities, if any, for refinancing all or any part of the long-term debt; and making the determination on an annual basis of whether any distributions should be made to the

members, even if only for the payment of taxes as provided for in the member control agreement. In that regard, the failure to schedule <u>any</u> member meetings since February 1998, appears to be unreasonable under the circumstances for reasons discussed more fully later herein. However, this finding must be tempered by the evidence of Roemmich's past non-attendance at member meetings, his conduct at past meetings, and his failure to exercise his rights under the Operating Agreement and North Dakota law to require a member meeting.

90.    The equities do not favor either dissolution of Eagle Eye or an order requiring that the Bertschs buy out Roemmich's 30% interest. The particular reasons and evidence upon which this finding and conclusion is made are discussed later herein. Also, the court finds that Roemmich's inequitable conduct substantially outweighs any inequitable or unreasonable conduct on the part of any of the defendants. In fact, the court specifically finds there has been no proof of inequitable or wrongful conduct on the part of Wagner. With respect to Jane Bertsch, there is some evidence that she has not been attentive to her duties as one of Eagle Eye's governors, but the court concludes that, at least to date, this has not proximately caused any harm or damage to Roemmich.

## CONCLUSIONS OF LAW

1.

In his complaint, Roemmich pled the claims of (1) unfairly prejudicial conduct towards a member; (2) breach of fiduciary duty to act in good faith towards another member; (3) breach of fiduciary duties to act in good faith by officers of a limited liability company; and (4) dissenters rights. At trial, he offered evidence of the following acts of alleged misconduct:

a.    Alleged fraud, unauthorized conduct, and self-dealing arising out of:

I.     payments to Bertsch Construction for reimbursement of expenses that allegedly have not been proven to be legitimate Eagle Eye expenses;

ii.     payments on Bertsch loans that Roemmich claims are either fraudulent or for which there is not sufficient proof the money ever found its way into Eagle Eye;

iii.     co-mingling of funds;

iv.     repayment of the Bertsch loans pursuant to unfavorable terms and the preferences given the repayment of the loans over other uses of the money;

v.     the disbursement of the lump sum award by the USPS on the Cocoa Beach change orders to Bertsch related entities in preference to other uses of the money;

vi.     the payment to Bertsch Construction of the 3% fee paid for project support services during construction;

vii.     the payment to Bertsch of compensation in the amount of $400 per week during the development phase of the projects; and

viii.     the hiring of Bertsch Construction to manage the post office projects post-construction pursuant to unfavorable terms, including the use of Bertsch Construction personnel to perform the hurricane-damage work in 2004.

b.     The alleged shutting-out of Roemmich from active participation in, or the ability to have input with regard to, the affairs of Eagle Eye arising out of:

I.     Roemmich's removal as one of two Eagle Eye governors in 1996 and the failure to subsequently reinstate him as one of the governors;

       ii.       the alleged failure to give appropriate notice of meetings;

       iii.      the alleged failure to provide financial and other corporate information; and

       iv.      the failure to consult Roemmich with respect to corporate decision-making, including the failure to hold any board of governors or members meetings for almost seven years.

    c.      The alleged freezing-out of Roemmich by denying him a fair return on his investment arising out of:

       I.       the failure to date to make any distributions of income to members;

       ii.      the preferences given to reimbursement of Bertsch Construction and Bertsch payables, and

       iii.      the claimed diminishment of his interest on account of the specific acts of fraud or self-dealing as set forth above.

In his post-trial submissions, Roemmich has requested that the court award monetary relief as follows:

    a.      Payment $41,600.00 in allegedly wrongful compensation paid to Bertsch.

    b.      Payment of the $72,434.00 charged by Bertsch Construction as a management fee.

    c.      Payment $128,723.32 of the USPS change order amount that went to the Bertsch related entities.

    d.      Payment of $10,000.00 as a reasonable estimation of the allegedly excessive charges on the hurricane repair.

    e.      Payment of sums the court believes are reasonable for the alleged breach of fiduciary duties.

In addition, Roemmich seeks an accounting and a court-ordered buyout of his interests by the Bertschs and Eagle Eye.

Since this is a diversity action, the court must apply the substantive law of North Dakota. Paracelsus Healthcare Corp. v. Philips Med. Sys., 384 F.3d 492, 495 (8th Cir. 2004).

2.

Roemmich's claims for relief are governed by one or more of the six-year limitations on actions set forth in N.D.C.C. § 28-01-16.  Roemmich v. Eagle Eye, 386 F. Supp. 2d 1089, 1092-94 (D.N.D. 2005).  This section applies to: claims arising out of contracts, express or implied; claims founded upon liabilities created by statute; claims for the wrongful taking or detention of personal property; claims of fraud arising in cases at law and equity; and other claims for injuries to rights of another, not arising out of contract, for which there is no other specific limitation period.  Id.

Under North Dakota law, the "discovery rule" has been liberally applied to most of the statutory limitations on actions and applies to the claims asserted in this case.  Id.; see, e.g., Wells v. First American Bank West, 1999 ND 179, ¶¶ 9-11, 598 N.W.2d 834 (contract actions); Beavers v. Walters, 537 N.W.2d 647, 650 (N.D. 1995) (fraud actions); Hebron Pub. Sch. Dist. No. 13 v. United States Gypsum Co., 475 N.W.2d 120, 126 (N.D.1991).  Under the "discovery rule," a cause of action does not accrue, and the limitations period does not begin to run, until a plaintiff "knew, or with the exercise of reasonable diligence should have known, of the wrongful act and its resulting injury."  Wells v. First American Bank West, 1999 ND 179, ¶ 10.  The test is an objective one with the focus being upon "whether the plaintiff is aware of facts that would place a reasonable person on notice a potential claim exists, without regard to the plaintiff's subjective beliefs."  Id.  Further, it is not necessary that a plaintiff have knowledge of the full extent of his or her injuries before the

55

limitations period begins to run; it is sufficient that the plaintiff knew or should have known that some injury has been suffered. See  Schanilec v. Grand Forks Clinic, Ltd., 1999 ND 165, ¶ 19, 599 N.W.2d 253; Erickson v. Scotsman, Inc., 456 N.W.2d 535 (N.D. 1990).

In this case, the court has found that Roemmich either knew prior to April 13, 1998, or with the exercise of reasonable diligence should have known, of the following conduct that he claims was wrongful and the fact that he may have suffered some injury:

a.    the payments to Bertsch Construction for reimbursement of project development expenses that Roemmich claims have not been proven to be legitimate Eagle Eye expenses;

b.    the payments on the Bertsch loans that Roemmich claims are either fraudulent, unauthorized, or of questionable legitimacy because of an alleged lack of proof that all of the money found its way into Eagle Eye;

c.    the specific instances of co-mingling of funds that have been alleged;

d.    the alleged unfavorable terms of repayment on the Bertsch loans and any repayment preferences, but only to the extent the preference was given prior to April 13, 1998.

e.    the disbursements from the lump sum awarded by the USPS on the Cocoa Beach change orders to Bertsch related entities;

f.    the payment to Bertsch Construction of the 3% fee paid for project support services during construction;

g.    the payment to Bertsch of the $400-per-week compensation during the development phase of the projects; and

h.      the hiring of Bertsch Construction to manage the post office projects post-construction pursuant to allegedly unfavorable terms, but only for the time period prior to April 13, 1998.

Consequently, these claims are time-barred in terms of any claim for damages.[4]  See also Nathanson v. Nathonson, 799 N.Y.S.2d 83, 85 (N.Y. Sup. Ct. App. Div. 2005).

One of the primary purposes for having statutes of limitations is to protect against having to defend stale claims for which evidence may be difficult to obtain, or has become lost, as a result of the passage of time.  E.g., Order of Railroad Telegraphers v. Railway Express Agency, Inc., 321 U.S. 342, 348-349 (1944); Erickson v. Scotsman, Inc., 456 N.W.2d at 537.  Another important purpose, particularly in the commercial context, is to make transactions settled after a period of time so that the persons and entities involved can have a reasonable modicum of stability in their affairs.

---

[4]  Prior to trial, and in response to the defendants' motion for summary judgment, Roemmich argued that the court should apply the "continuing tort" doctrine, and that, if the court did so,  he would then be allowed to recover damages for acts occurring prior to April 13, 1998.  The court ruled, however that the alleged acts of wrongful conduct, which the court now concludes are time-barred, were sufficiently separate and discrete, with their own separate and successive injuries, so that each act constituted a potential breach of duty standing alone and that application of the "continuing tort" doctrine would not be proper.  Roemmich v. Eagle Eye, 386 F. Supp. 2d at 1092-94.  This pretrial ruling is reaffirmed.  Further, even if a "continuing violation" doctrine were to be applied, this does not mean that damages suffered outside the limitations period would be recoverable.  A number of courts have held that, in certain types of  "continuing violation" cases, a new cause of action accrues with each day of the violation so that the statute of limitations bars causes of action accruing outside the limitations period, but not those accruing within the limitations period, with the result being that only damages suffered within the limitations period are recoverable.  See, e.g., Klehr v.  A.O. Smith Corp., 521 U.S. 179, 189-190 (1997) (antitrust violations); Hoery v. United States, 324 F.3d 1220, 1223-24 (10th Cir. 2003) (FTCA claim for continuing tort); Tucker v. Southern Wood Piedmont Co., 28 F.3d 1089, 1090-1091 (11th Cir.1994) (continuing tort - applying Georgia law); Arcade Water Dist. v. United States, 940 F.2d 1265, 1269 (9th Cir.1991) (FTCA continuing nuisance claim); Miller v. Cudahy Co., 858 F.2d 1449 (10th Cir. 1988) (continuing nuisance); but see Gross v. United States, 676 F.2d 295, 300 (8th Cir.1982) (FTCA action).  While the court is not aware of any definitive ruling in North Dakota, this is likely the rule that would be adopted in a case that squarely presents the issue, at least for the types of claims involved in this case.  Cf. Peacock v. Sundre Township, 372 N.W.2d 877, 879 (N.D. 1985) (successive actions can be brought for continuing damage to real property); Rynestad v. Clemetson, 133 N.W.2d 559 (N.D. 1965) (same); but cf. Beavers v. Walters, 537 N.W.2d 647 (N.D. 1995) (statute of limitations does not begin to run for continuing tort until the tortious acts cease in a fraud case involving non-payment of royalty although statement may be dicta because case was largely resolved on grounds of lack of discovery); O'Fallon v. Pollard, 427 N.W.2d 809 (N.D. 1988) (statute of limitations on claim of false arrest does not commence until release from imprisonment).

57

See generally 51 Am. Jur. 2d Limitation of Actions §§ 16-17.  Both are strong reasons why, in case

such as this, it is not unreasonable to expect a limited liability company member to act within the

legislatively-prescribed time if the member wishes to obtain monetary relief for conduct on the part

of others that is believed to be wrongful.

        Roemmich claims that the six-year statute of limitations does not bar his claims for equitable

relief, including his claim for an accounting and for relief under N.D.C.C. § 10-32-119. As discussed

in more detail below, § 10-32-119 grants the court broad power to order equitable relief in certain

situations, such as when corporate assets are being misapplied or wasted or when a member has

engaged in conduct that is fraudulent, illegal, or unfairly prejudicial to another member.  The policy

considerations for not allowing stale claims, however, are equally applicable to claims for equitable

relief.  And, in North Dakota, the courts have applied the general legislatively imposed time limits

to claims for equitable relief.  See, e.g., Diocese of Bismarck Trust v. Ramada, Inc., 553 N.W.2d 760

(N.D. 1996) (applying the ten-year statute of limitations in an equitable action for reformation);

Schmidt v. Grand Forks Country Club, 460 N.W.2d 125 (N.D. 1990) (applying the six-year statute

of limitations to the statutory claim of rescission); cf. N.D.C.C. § 28-01-16(6) (specifically

referencing claims at law and in equity).  Consequently, not only barred are Roemmich's demands

for monetary relief, but also his request for an accounting.  In fact, the court reached the same

conclusion earlier when it dismissed defendants' claims for equitable relief.

        Roemmich also argues that, even if equitable claims are subject to the statutes of limitations,

§ 10-32-119 is an exception because subsection (3) allows the court to consider conduct that has

taken place outside what would otherwise be the limitations period.  He also references cases in

which the courts have considered conduct that has extended literally over decades, and obviously

58

beyond any limitations period,  in determining whether equitable relief should be given to a minority owner.

However, there is nothing in § 10-32-119 which suggests that general statutes of limitations are not applicable to claims for relief under this section.  In particular, the language that Roemmich points to in subsection (3) relates only to the court's consideration of the reasonable expectations of the parties at the inception of the limited liability company, or as may have developed thereafter, in terms of deciding whether later occurring conduct has been unfairly prejudicial.  The language does not purport to authorize litigation of stale claims.

Further, the cases in which the courts have considered conduct occurring over a substantial period of time are not inapposite; the statute of limitations is a defense, not a rule of evidence.  E.g., Sir Speedy, Inc. v. L & P Graphics, Inc., 957 F.2d 1033, 1038 (2nd Cir. 1992).  If an action is timely, the only restraints on consideration of evidence outside the limitations period, generally speaking, are relevancy and weight.  Id.

Consequently, the court concludes that, in order for a claim for equitable relief under § 10-32-119 to be timely, there must be some proof of conduct actionable under this section occurring within the limitations period.  Cf. Carpenter v. Rohrer, 2006 ND 111, ¶ 31, 714 N.W.2d 804. However, once that is determined, evidence of conduct occurring outside the limitations period may be considered with respect to the reasonable expectations of the parties as required by  § 10-32-119(3) and may be considered for other purposes, including background and any purposes permitted by Fed. R. Evid. 404(b).  Cf. United Airlines, Inc.  v.  Evans, 421 U.S. 553, 558 (1977) (evidence of a discriminatory act outside the limitations period be relevant for background purposes).

The court concludes there are acts within the limitations period that raise issues with respect to whether or not Bertsch has acted in an unfairly prejudicial manner, including: the fact that there has been no meetings members since 1998; the practice of sending only K-1's to Roemmich and not any of the other more detailed financial information beginning at least with the calendar year 1999; and the lack of corporate records explaining corporate decision-making since 1999. Consequently, if one or more of the foregoing are sufficient to constitute "unfairly prejudicial" conduct within the meaning of § 10-32-119(1)(b)(2), a claim for equitable relief pursuant to § 10-32-119(1) would be timely.

3.

Roemmich complains that decisions have been made without prior consultation with him, that unauthorized actions have taken place, and that Bertsch has shut him out from active involvement in the management of the company.   In this section, the court will address the history of compliance with respect to the requirements of Eagle Eye's governing documents and the provisions of the North Dakota Limited Liability Company Act that address corporate formalities. In later sections, the court will address the obligations of members when acting as governors in terms of related-party transactions and the duties owed by members to each other in closely-held companies.

Under N.D.C.C. § 10-32-89(1)(a), the president of a limited liability company is empowered with the "general active management for the business of the limited liability company," unless the company's organizing documents or a resolution of the board of governors provides otherwise. This is the same authority that is vested in presidents of corporations under § 10-19.1-53(1)(a) of North Dakota's Business Corporation Act.

The generally accepted view is that, when a president has been vested with the powers of a general manager, he or she has broad authority to undertake all acts within the ordinary course of a the corporation's business without first obtaining the approval of the board of directors or the shareholders unless otherwise constrained by the corporation's organizing documents or by prior actions of the board of directors or shareholders.  See, e.g., Schoonejongen v. Curtiss-Wright Corp., 143 F.3d 120, 127-128 (3rd Cir. 1998); Kenney v. Emge, 972 S.W.2d 616, 619 (Mo. Ct. App. 1998); Holman v. Dow, 467 S.W.2d 547, 552 (Tex. Ct. Civ. App. 1971); Missouri Valley Steel Co. v. New Amsterdam Company, 148 N.W.2d 126, 439-440 (Minn. 1966); Barber v. Stromberg-Carlson Telephone Mfg. Co., 116 N.W. 157, 158 (Neb. 1908); see generally 18B Am. Jur. 2d Corporations §§ 1337-1338; Henn & Alexander, Laws of Corporations § 596 (3rd  Ed. 1983); 2 Fletcher Cyclopedia of the Law of Private Corporations § 557 (2006); Dunnel Minn. Digest Corporations § 8.08 (4th ed.) (construing similar statutory language under Minnesota law and noting that a president can be empowered with the full power to carry on the business of the corporation without reference to stockholders or directors).

While there are no North Dakota cases construing this grant of presidential power under § 10-19.1-53(1)(a) or § 10-32-89(1)(a), it is clear from the foregoing authorities that the words "general active management" are words of art intended to convey the broadest possible authority consistent with the general scope and operation of a corporation or a limited liability company.  And, in this case, the statutory language giving the president the powers of a general manager is repeated in Eagle Eye's governing documents and is not otherwise constrained except in two relevant instances.  The first are the provisions in Sections 2.15 and 3.06 of  Eagle Eye's Operating Agreement that require board of governors' approval for compensation paid to governors and to

managers.  The second is Section 3.08 of the Member Control Agreement that requires board of governors' authorization for loans made by members.

In terms of the company actions that Bertsch questions in this case, only two categories present issues of lack of compliance with corporate formalities.  The other company actions were within the scope of Bertsch's authority and approval.  Consequently,  prior approval of the board of governors or the members, including Roemmich, was not required at least in terms of compliance with corporate formalities.

The first actions raising issues of non-compliance with corporate formalities are the loans made by the Bertschs in 1996 to keep Eagle Eye afloat.  There is no evidence that these loans, some of which were made while Roemmich was still a governor, were approved by the board of governors as required by Eagle Eye's Membership Agreement.  However, at the same time, a separate loan was to Eagle Eye that Roemmich guaranteed, which also was not approved by the board of governors and Roemmich did not insist that corporate formalities be followed with respect to this transaction. Further, the Bertsch loans were later ratified, at least implicitly, at subsequent member meetings. Finally, the Bertsch loans all were made outside the limitations period and the court has concluded that the time for challenging these transactions has expired, at least in terms of the principal amounts and also any interest paid prior to April 13, 1998.

But, even if the loans had been made within the limitations period, this does not mean that Roemmich would be entitled to monetary relief.  See, e.g., Gunderson v.  Alliance of Computer Professionals, Inc., 628 N.W.2d 173, 188 (Minn. Ct. App.  2001) (every failure to comply with corporate formalities does not require that relief be granted); O'Neal and Thompson's Close Corporations and LLCs: Law and Practice § 1.18 (Rev. 3rd ed.) ("O'Neal and Thompson's Close

Corporations"). The court has found that the loans were not fraudulent and the terms reasonable. Moreover, Roemmich's interest was enhanced because the loans allowed the company to survive and successfully complete the projects. Consequently, based on these and the other circumstances already outlined, Roemmich would not be entitled to affirmative relief in terms of either payment of damages to him or an order that the money be restored to the company. See id.

The other action raising an issue of non-compliance with corporate formalities is the payment to Bertsch of compensation for his work during the development and construction period. Because at least part of the payment was for work Bertsch did in his capacity either as a governor or manager, there was non-compliance with the requirements of the Operating Agreement that the compensation be approved by the board of governors.

But, in this case, this simply meant Bertsch needed to get the approval of his wife, Jane, which in all probability would have been forthcoming given the evidence that she deferred to her husband on all matters related to Eagle Eye. Further, even if Jane Bertsch had deadlocked with her husband on this matter, Bertsch, as a 70% member, had the ultimate authority to make the decision. However, this would have required a member meeting and notice to Roemmich.[5]

The payment to Bertsch in question occurred outside the limitations period, and, for the reasons already discussed is not actionable in terms of the court awarding affirmative relief. However, putting aside the issue of timeliness, the court would not be inclined to grant Roemmich damages or an order requiring some monetary adjustment. The court has found that the amounts paid to Bertsch were reasonable and there is nothing inherently wrong with a governor or member

---

[5] Under Eagle Eye's Operating Agreement, the votes of the two governors count equally. Further, in order for the governors to act, a quorum is necessary.

being appropriately compensated for work performed on behalf of the company.  In fact, presumably this would be in keeping with the interests of the company.  Further, any expectation that Roemmich had that Bertsch would not be receiving compensation for the work he performed, and which substantially enhanced the value of his interest, even if reasonable initially, was justifiably negated by his own inequitable conduct and the changed circumstances with respect to the amount of work that Bertsch was forced to perform.  Finally, to some extent, the payment was only a technical violation given the relationships that existed and Bertsch's ultimate authority as a 70% owner.

Nevertheless,  persons choosing a limited liability company form of doing business and who ignore corporate formalities do so at their own peril, particularly when there are dissenting minority owners.  The fact that the payment occurred under the circumstances it did is relevant to the court's consideration of the claims of unfairly prejudicial conduct occurring within the limitations period in terms of background, motive, and the need for some judicial intervention.  The same is true with respect to the Bertsch loans.

4.

Roemmich also claims that the defendants engaged in unlawful self-dealing with respect to the related-party transactions.  The specific transactions  he complains about are the Bertsch loans, the contract with Bertsch Construction for the period of development and construction of the projects, the agreement with Bertsch Construction for post-construction management (including the hurricane damage repair), and the separate payments made to Bertsch for his work during project development and construction.

There is nothing inherently wrong or unlawful about engaging in transactions with related parties.  In  recognition of this fact, North Dakota's Limited Liability Company Act addresses the

64

potential for abuse by defining those related-party transactions that are authorized (N.D.C.C. § 10-32-87) and then relies upon the more general obligations of governors and managers to act in good faith and in the best interests of the company, along with the fiduciary duties imposed upon members of closely-held companies, to provide the necessary limitations upon the related-party transactions that are not specifically authorized.  Within the list of related-party transactions that are not void or voidable as a matter of law is the following:

> a.   The contract or transaction was, and the person asserting the validity of the contract or transaction sustains the burden of establishing that the contract was, fair and reasonable as to the limited liability company at the time it was authorized, approved, or ratified.

N.D.C.C. § 10-32-87(2)(a).

In this case, for the reasons set forth in the findings of fact, the court concludes that the defendants have met their burden in demonstrating that the related-party transactions challenged by Roemmich were fair and reasonable as to Eagle Eye, including those occurring outside the limitations period.

5.

North Dakota's limited liability company law is strongly-protective of minority rights.  In addition to imposing certain fiduciary duties upon members, governors, and officers as described in more detail below,  N.D.C.C. §10-32-119(1)(b) authorizes a court to grant any equitable relief it considers just and reasonable in an action instituted by a member when one or more of the following are established:

> (1)   The governors or the persons having the authority otherwise vested in the board are deadlocked in the management of the affairs of the limited liability company and the members are unable to break the deadlock;
>
> (2)   The governors or those in control of the limited liability company have acted fraudulently, illegally, or in a manner unfairly prejudicial toward one or more

65

members in their capacities as members or governors of any limited liability company or as managers or employees of a closely held limited liability company;

(3)     The members of the limited liability company are so divided in voting power that, for a period that includes the time when two consecutive regular meetings were held, they have failed to elect successors to governors whose terms have expired or would have expired upon the election and qualification of their successors;

(4)     The limited liability company assets are being misapplied or wasted; or

(5)     An event of dissolution has occurred under subdivision a, d, or e of subsection 1 of section 10-32-109 but the limited liability company is not acting to wind up its affairs . . .

In this case, the court concludes that the management of the affairs of the Eagle Eye is not deadlocked under subsection (1)(b)(1) and that Eagle Eye's assets have not been misapplied or wasted under subsection (1)(b)(4).  Further, with respect to subsection (1)(b)(2), the court concludes the defendants have not acted fraudulently or illegally.  Thus, the court turns its attention to whether Roemmich has proved that one or more have the defendants have acted in a manner that is "unfairly prejudicial" to his interests within the meaning of §10-32-119(1)(b)(2).

Chapter 10-32 does not offer a specific definition of the term "unfairly prejudicial." The term first became a part of North Dakota's law in 1985, when provisions, similar to those presently found in § 10-32-119, were added to the chapter governing corporations.  The 1985 changes to North Dakota's corporations law were patterned after those adopted earlier in Minnesota to strengthen the protection of minority rights, particularly in close corporations. The history of the adoption of the term "unfairly prejudicial" in Minnesota, along with the other changes that were made to strengthen minority rights, is chronicled in Olson, A Statutory Elixir for the Oppression Malady, 36 Mercer L. Rev. 627 (1985) (written by one of the authors of the Minnesota provisions) ("Olson").  North Dakota's adoption of similar provisions is discussed in MacDonald, Corporate Behavior and the Minority Shareholder: Contrasting Interpretations of Section 10-190.1-115 of the North Dakota

Century Code, 62 N.D. L. Rev. 155 (1986) ("MacDonald").  See also MaCallum v.  Rosen's Diversified, Inc., 153 F.3d 701, 703 (8th Cir.  1998) (addressing the history of Minnesota statute); PJ Acquisition Corp.  v.  Skoglund, 453 N.W.2d 1, 18-19 (Minn.  1990) (same).

The term  "unfairly prejudicial" was chosen by the drafters of the Minnesota law to replace the term "persistent unfairness" with the hope the change would  broaden the scope of conduct that would be subject to the equitable powers of the courts and to make clear that even single instances of prejudicial conduct would be enough to justify granting relief.  Further, the term "unfairly prejudicial" was chosen in lieu of the term  "oppressive," which has used by a  number of other states (including North Dakota at that time), because of a concern that courts were construing the term as requiring a higher threshold of wrongful conduct than the drafters believed appropriate, including requiring some evidence of  bad faith.  Olson at 632-642.

After North Dakota had adopted changes similar to those made in Minnesota, including replacing the term "oppressive" with "unfairly prejudicial, the North Dakota Supreme Court had occasion to construe the term "oppressive" in a case in which the older law still applied.  In its opinion, the court noted the statutory changes that had been made and proceeded to construe the term "oppressive" quite broadly and, essentially, in the manner that the drafters of the Minnesota law hoped the term "unfairly prejudicial" would be construed.  Blavik v. Sylvester, 411 N.W.2d 383 (N.D. 1987) (applying older corporations law and noting the change in the newer law from the use of the term "oppressive" to "unfairly prejudicial").

In Blavik, the court held that, since the older statute used the term "oppressive" in addition to the words "illegal" and "fraudulent" in describing the conduct that would be subject to scrutiny, this meant the term "oppressive" should be construed broadly "to cover a multitude of situations

dealing with improper conduct which is neither 'illegal' or 'fraudulent.'" Id. at 385-386.  More specifically, the court held that "oppressive" conduct could be that amounting to a "freeze-out" of minority interests, it could be a breach of a fiduciary duty owed by the majority to the minority, or it could be conduct that unfairly deprives the minority of its "reasonable expectations" when it committed capital or labor to the enterprise.  Id. at 386-388.

The statutory changes strengthening minority rights, which were made to North Dakota's corporations law in 1985 and later included in the limited liability company law when it was first enacted, for the most part, simply reinforced what the supreme court later decided in Blavik was already the law under the older statutory scheme. This being the case, and given the history behind the 1985 changes, it is clear that the term "unfairly prejudicial" is to be construed liberally to cover virtually any form of unreasonable conduct that has an unfair impact, even though the conduct may not have been fraudulent or illegal and regardless of whether there has been bad faith.  See, e.g., Brandt v. Sommerville, 2005 ND 35, ¶¶ 7-9,692 N.W.2d 144; Kiriakides v. Atlas Food Systems & Services, Inc., 527 S.E.2d 371, 385-388 (S.C. Ct. App. 2000); Berreman v. West Publishing Company, 615 N.W.2d 362, 373-374 (Minn. Ct. App. 2000); PJ Acquistion Corp. v. Skoglund, 453 N.W.2d at 18-19; O'Neal and Thompson's Close Corporations at § 1.22.

And, in terms of the categories of conduct discussed in Blavik, the term "unfairly prejudicial" includes conduct that amounts to a freeze-out of the minority.  See id.  Also, it encompasses breaches of the fiduciary obligations imposed by chapter 10–32, of which there are several.  See id.  Sections 10-32-86 and 10-32-96 impose upon governors and managers, respectively, the duty to act in good faith and in the bests interests of the company.  And, for closely

68

held companies such as Eagle Eye, all members owe each other the duty to act honestly, fairly, and reasonably under the following provisions of § 10-32-119(4):

> In determining whether to order relief under this section and in determining what relief to order, the court shall taken into consideration the duty that all members in a closely held limited liability company owe another to act in an honest, fair, and reasonable manner in the operation of the limited liability company and the reasonable expectations of the members as they exist at the inception and develop during the course of the members' relationship with the limited liability company and with each other.

Finally, it is also clear that the term "unfairly prejudicial" includes conduct that unfairly deprives minority members of their "reasonable expectations."  E.g., Kiriakides v. Atlas Food Systems & Services, Inc., 527 S.E.2d at 385-388; Berreman v.  West Publishing Company, 615 N.W.2d at 373-374 .  In fact, this is now covered by statute as indicated by the above quoted language from § 10-32-119(4).

Before considering whether there has been "unfairly prejudicial" conduct in this case, two additional points are worthy of note.  The first has to do with determining more precisely what  is meant by the "reasonable expectation" language of  § 10-32-119(4).  Does it include unilaterally-held expectations that are reasonable or only those the court is convinced are mutually shared by all the members?  Further, even if it is not required that the expectations be mutually shared, must the expectations have been communicated to the other members in some fashion, or can subjectively-held expectations be considered provided the expectations are reasonable?

Based on the particular language used by § 10-32-119(4), it appears that the expectations contemplated are those that are found, on an objective basis, to be mutually held as a consequence of having been communicated in some fashion to the other members, either explicitly or implicitly.  See, e.g., Royals v. Piedmont Electric Repair Company, 529 S.E.2d 515, 518 (N.C. Ct. App. 2000);

69

Gunderson v. Alliance of Computer Professionals, Inc., 628 N.W.2d 173, 191 (Minn. Ct. App. 2001); Olson at 654-658 (stating that there is an objective component similar to the objective theory of contract formation), cf. Blavik, 411 N.W.2d at 387-388 (applying the older law that did not contain an express obligation to consider the reasonable expectations of members, but which the court implied was a requirement).  And, in any event, what clearly are not encompassed by the statutory language are subjectively-held expectations that amount to nothing more than mere hopes and desires.  See id.

        The second point is the fact that the court must also consider the conduct of the person seeking relief in determining whether unfairly prejudicial conduct has occurred and whether the person is entitled to any relief, as a consequence, after balancing the equities under N.D.C.C. § 10-32-119.  For example, a member may be denied relief  based upon an alleged deprivation of reasonable expectations if it is clear the member's own conduct was largely the cause of the deprivation.  E.g., Gunderson v. Alliance of Computer Professionals, Inc., 628 N.W.2d at 192 ("an expectation of continuing employment is not reasonable and oppression liability does not arise when the shareholder-employee's own misconduct or incompetence causes the termination of employment"); Royals v. Piedmont Electric Repair Company, 529 S.E.2d at 520-521.  Zidell v. Zidell, 560 P.2d 1086, 419-421 (Or. 1977) (stockholder cannot complain about not receiving periodic income from a closely-held corporation when he voluntarily terminated his employment).

        In this case, Roemmich argues that he has been "frozen-out" of his ownership interest in Eagle Eye because he has not received any financial benefit in terms of employment or distributions of income since he left Florida.  Further, he contends that, on the other hand, Bertsch has bled money from the company in variety of ways, including payments to himself and Bertsch

70

Construction during project development, payments on loans made by the Bertschs, and payments to Bertsch Construction for post-construction management - all to his financial detriment.

However, the court has found that Roemmich had no reasonable expectation of continued employment, either at the inception of his involvement or thereafter.  The only expectation he had was to short-term employment during the development of the Florida projects that he hoped he could parlay into a 30% ownership interest in Eagle Eye without having to make any other contributions. A subjective hope that something else might follow is not sufficient.  Further, Roemmich forfeited his right to even have this considered when he abandoned the Florida projects and created the circumstances that justified the cessation of his salary.

Likewise, the court has found that Roemmich had no reasonable expectation of any immediate and regular distributions because he understood from the beginning that the post office projects were a long-term investment and that it may take years before there would be any significant distributions.  The only exception is the provisions of Section 3.04 of the Member Control Agreement that provide for an annual distribution to assist the members in paying the portion of their taxes based on company income.  However, this matter was not addressed during the trial in any significant way.  The evidence before the court suggests there has not been any significant income to date, let alone sufficient money to distribute for this purpose, for this to have been a present concern.  However, going forward this may need to be addressed on a yearly basis.


Also, the court has found that the payments to Bertsch individually, to Bertsch and his wife on the Bertsch payables, and to Bertsch Construction, both during development of the projects and post-construction, have been reasonable and that Roemmich has not suffered any unfair financial

71

prejudice. In fact, the successful completion and prudent management of the projects has resulted in Roemmich's interest being substantially enhanced.

Roemmich also claims he had an expectation of active participation in the management of Eagle Eye that he has now been shut-out from.  He further contends that he is not being provided basic corporate information, both financial and otherwise, related to the operation of Eagle Eye and that this is unreasonable under the circumstances.   These are closer issues.

Since the inception of Eagle Eye, Bertsch has always been a 70% owner of the company. Consequently, the reality is that he has, and should have, primary say with respect to the affairs of Eagle Eye, subject to his fiduciary obligation to act in good faith and in the best interests of the company when he is acting either as a governor or manager and subject to his obligations under § 10-32-119(4) to act in a honest, fair, and reasonable manner, including giving consideration to the reasonable expectations of Roemmich's minority interest.

But, while Roemmich never had a reasonable expectation of an *equal* say in the decision-making of Eagle Eye, there was a mutual understanding at the time he became involved that he would have active involvement in Eagle Eye's management and this was confirmed by his immediate appointment as a governor and to several officer positions upon acquisition of this 30% ownership interest.  Further, this expectation was reinforced during the remainder of 1995, and the first part of 1996 until problems developed, by the periodic meetings that were held to discuss and vote upon various corporate actions.

Also, a consequence of Roemmich's active participation in the management of Eagle Eye initially, was that he was kept advised of all major corporate decisions. Likewise, there also developed during 1995 and 1996 an expectation that Roemmich, as a 30% owner, would be provided

basic financial information for the company, including income statements, balance sheets, tax returns, and general ledger information, without having to make a demand.

The court concludes that Roemmich forfeited any expectation he had to participate actively in the day-to-day management of Eagle Eye as a result of his inequitable conduct and the breaches of his duties to act in a fair and reasonable manner. Consequently, the court concludes that his removal as a governor was warranted and that he has not been unfairly prejudicial by the refusals to reinstate him to that position. The particular conduct upon which the court relies is detailed below in the court's discussion of remedies. Nevertheless, Roemmich remains a 30% minority owner in a company that has only two owners.

Under these circumstances, the court believes that fair and reasonable treatment requires at least the opportunity for Roemmich being able to provide input with respect to major company decisions and, more importantly, a meaningful opportunity to monitor the activities of the company to protect his 30% interest. This being the case, the court concludes that Bertsch overreacted when he instructed Wagner to stop sending Roemmich the financial information that previously had been forwarded to him on a routine basis and to send him only the K-1's required for his tax preparation. The court also concludes that not holding *any* member meetings since 1998 has also been unreasonable, particularly when coupled with the lack of any company records since 1999 documenting corporate decision-making.

The net result of this conduct has been the operation of Eagle Eye by Bertsch, at least since 1999, with little opportunity for input by Roemmich. And, more importantly, given the realities of Bertsch's control, it has created a situation in which it is difficult for Roemmich to monitor Eagle

Eye's activities and finances on a going-forward basis to insure that he is not being financially prejudiced, even though there is no evidence to date that he has suffered any financial detriment.

In reaching this conclusion, the court has also considers the lack of documented decision-making with respect to the payment of the Bertsch compensation and the fact that Bertsch technically exceeded his authority with respect to these payments. In addition, the court considers the poor documentation related to the Bertsch payables. Consequently, the court concludes that Roemmich has suffered unfair prejudice with respect to the information that is not being provided to him on a routine basis, the lack of documentation for current decision-making, and the failure to hold any member meetings for more than six years preceding the filing of the complaint.

The fact that none of Bertsch's conduct has been illegal and that all of it, with the exception of the payment of compensation to him during development and some of the borrowing with respect to the initial cash infusions by the Bertschs and Roemmich, has been in compliance with Eagle Eye's operating documents, does not prevent the court from reaching this conclusion. While these are factors the court must consider, the obligation on the part of a member of a closely-held company to act reasonably under § 10-32-119(4) imposes obligations that go beyond minimal compliance with state law and the provisions of a company's governing documents.

The court, however, reaches this conclusion reluctantly because the court is convinced that things would not have gotten to this point had Roemmich acted fairly and reasonably. Further, the court is bothered by Roemmich's failure to take advantage of the remedies that have been available to him. However, given the low threshold for conduct that is actionable under § 10-32-119(4), and all of the other facts and circumstances, the fact the court places primary responsibility upon Roemmich for the current situation should not be a basis for denying all relief. Rather, in this case,

this is a factor that the court should more appropriately consider, along with others, in deciding

what relief is appropriate and in assessing costs and attorney fees.

Once it is determined that "unfairly prejudicial" conduct has occurred, § 10-32-119(1)

provides that the court "*may grant any* equitable relief it considers just and reasonable under the

circumstances." (emphasis added) Further, § 10-32-119(3) requires that:

> In determining *whether to order relief* under this section and in determining *what relief to order*, the court *shall* take into consideration the financial condition of the limited liability company but may not refuse to order any particular form of relief solely on the grounds that the limited liability company has accumulated or current operating profits.

(emphasis added). Thus, the court has broad discretion in deciding, first, whether relief should be

granted and, secondly, if so, what relief would be appropriate. The only specific limitation is § 10-

32-119(6), which makes clear that liquidation should be a last resort. See Brandt v. Sommerville,

2005 ND 35, at ¶ 23.

Roemmich argues that he is entitled to a court-ordered buyout of his interests, which is a

favored remedy when a minority-interest owner has been unfairly deprived of an expectation of

employment or has otherwise been frozen-out of his or her financial interest. In this case, neither

of these situations is present and the cases cited by Roemmich in support of his argument for a buy-

out are all distinguishable on this basis.

In this case, after balancing the equities, the court concludes the relief afforded in the order

set forth below is more appropriate than a forced buy-out for the following reasons:

a       Roemmich's inequitable conduct, including his breach of his fiduciary obligation to

        "to act in an honest, fair, and reasonable manner" under N.D.C.C. § 10-32-119(4),

which have altered the reasonable expectations of the members during the course of their relationship.  More specifically, this includes, among other things:

I.     his accusations of fraudulent and criminal behavior on the part of Bertsch and his threats to report this conduct to the authorities;

ii.    his contacting Eagle Eye's bankers at time when the company was having financial difficulties and repeating his charges of fraudulent and illegal conduct;

iii.   his unreasonable failure to meet with Bertsch to attempt to work things out in a civilized manner, despite repeated requests that he do so;

iv.    his inability to conduct himself in a reasonable manner at several of the corporate meetings;

v.     his threats of physical harm to Wagner; and

vi.    his abandonment of the Florida projects, and particularly the Cocoa Beach project when it was in trouble.

b.    The lack of evidence of mismanagement of Eagle Eye or Roemmich having been frozen-out of his interest.  In fact, the evidence is that Roemmich's 30% interest has substantially gained in value with the successful completion of the projects due largely to Bertsch's efforts.

c.    The court's conclusion that Roemmich is primarily responsible for the current dissension coupled with his having suffered no financial detriment.  Under these circumstances, forcing Bertsch to buy him out would amount to oppression of the majority - an evil at least equal to oppression of the minority.

d.     Under N.D.C.C. §§ 10-32-51 and 10-32-52, a member has the right to demand access to corporate records and the right to the development of certain basic financial information.  Also, under Section 1.04 of the Operating Agreement and the provisions of §§ 10-32-37 and 10-32-38, a member has the right to demand a regular meeting of the members, when such a meeting has not held within a defined time, and also special meetings of the members.  Since 1999, Roemmich has not availed himself of any of these remedies and did not attend, either in person or by proxy, the member meetings in 1996 and 1998.  Instead, he has chose to stand back and lob accusations of fraudulent and illegal conduct over the ramparts and threaten people that he would report them to the authorities.  The court was not impressed by these tactics.  Further, the court  is not inclined to order the drastic relief of a buyout when Roemmich has failed to avail himself of his other rights and remedies.

e.     The fact there is less-drastic relief the court can provide that is more tailored to the conduct found to be unreasonable in terms of ordering that certain information be provided to Roemmich on a routine basis and that yearly meetings of the members held.  This would allow Roemmich to monitor the affairs the company and provide some input into the management - if he chooses to do so.  Finally, there are financial restrictions the court can impose that provide a reasonable modicum of protection for Roemmich's 30% interest.  Cf. 2 O'Neal and Thompson's Oppression of Minority Shareholders and LLC Members § 6:9 (2006).

f.     The valuation of closely-held shares in a minority corporation is a difficult and complex process that is often inexact.  E.g. Fisher v. Fisher, 546 N.W.2d 354, 357-

358 (N.D. 1996).  Even though it is a less extreme remedy than dissolution, it still

amounts to drastic relief that should not be ordered unless there is good reason.

g.      The court rejects the argument that the existence of dissension alone requires a buy-

out.  If that was what was intended by the provisions §10-32-199, it would have been

easy to provide for that specifically.  Instead, the statutory provisions command that

the court consider the equities and order such relief as may be appropriate.

Moreover, if the parties wanted the ability to terminate their relationship upon

demand, they could have chosen one of the partnership models of doing business.

6.

N.D.C.C. § 10-32-119(8) provides that the court "in its discretion" may award reasonable

expenses, including attorney's fees and disbursements, when a party is found by the court to have

acted "arbitrarily, vexatiously, or otherwise not in good faith."  Because the court bifurcated the

issue of liability from a determination of the complete relief that the court might order, the issue of

whether any costs and attorney fees should awarded remains an open issue that will be addressed

by a subsequent order after further proceedings.

Further, in determining what equitable relief is appropriate under § 10-32-119(1), the court

cannot make a final determination until it is able to assess the impact on the ownership interests of

the two members of any attorney fees and costs that have been, or will be, paid by Eagle Eye.

Consequently, the relief awarded below pursuant to § 10-32-119(1) is only partial and further relief

may be ordered following additional proceedings in this matter.

78

## ORDER

Based on the foregoing findings of fact and conclusions of law, it is hereby **ORDERED** as follows:

1.      Plaintiff's claims for monetary relief and for an accounting shall be dismissed with prejudice as to all the defendants.

2.      Eagle Eye Development LLC (the Company), together with its members and governors, will be permanently ordered and enjoined as follows:

      a.      Unless specifically authorized by all of the members in writing to the contrary, the Company shall not engage in any business activity other than that which relates to the managing, leasing, or sale of the real estate now owned by the Company at Mims and Cocoa Beach, Florida and Mora, Minnesota (the "Company Real Estate") and the making of any distributions to the members.

      b.      Unless authorized by all of the members in writing to the contrary, the Company may not use Company money for any purpose other than (1) paying the debts incurred to construct and develop the Company Real Estate, (2) paying expenses for the management, maintenance, repair, improvement, leasing, or sale of the Company Real Estate, including any debts reasonably incurred for these purposes, (3) paying reasonable salaries and Company overhead and operating expenses, including payments to third parties for management and other support services, and (4) making distributions to members.

79

c.  Unless authorized by all of the members in writing to the contrary, beginning in 2007 the Company shall hold at least one meeting of the members annually, which shall take place after completion of the end-of-year financial statements for the prior year, but no later than the deadline for the Company filing its annual income tax returns, to discuss, at a minimum, the following subjects:

   I.    the operating results for the prior year;

   ii.   discussion and approval of the tax returns for the prior tax year;

   iii.  discussion and approval of an operating budget for the next 12 months with budgeted amounts for depreciation, debt service, and each general category of operating expenses; and

   iv.   discussion and a decision as to whether any distributions should be made to the  members, including, specifically, distributions to assist members with the payment of their taxes on Company income.

d.  Except for debt service payments for liabilities already incurred or legitimate emergencies, no expenditure may be made or liability incurred with respect to any particular item or matter in excess of $ 25,000.00 without the expenditure or liability first being discussed and approved at an annual or special meeting of the members.  And, notwithstanding the foregoing, no compensation may be paid to a governor, member, or manager, nor may payments be made to an entity related to any of the foregoing persons, without the compensation or payments (or the basis for the compensation or

payments) first being discussed and approved at a regular or special meeting of the members, with the only exception being the current terms of the arrangements with Bertsch Construction for management, maintenance, and repair of the Company Real Estate, which the court has already concluded are reasonable.

e.      The Company shall provide yearly to each member copies of the following financial information for the prior calendar year: the balance sheet and income statement; detailed general ledger; and a copy of the proposed tax returns to be filed. If not sent earlier, this information shall accompany the notice of the annual member meeting.

f.      Minutes shall be prepared reflecting the action taken at all meetings of the members and board of governors and copies shall be sent to the members within ten business days of the date of the meeting. When action is taken by the members or the board of governors without a meeting as may be authorized by the Company's organizing documents or North Dakota law, written documentation of the action shall be made, kept with the Company records, and copies sent to the members within ten business days.

g.      Within ten days of entry of judgment, the Company shall provide to each member, and each member shall provide to the Company, an address for all future mailings and notices. If for any reason an address changes, the person whose address changes must provide notice in accordance with section 9.7 of Company's Membership Control Agreement.

81

   h.      A copy of these provisions shall be affixed to, and become a part of, the
Company Operating Agreement and shall be deemed to supersede any
conflicting provisions in either the Company Operating Agreement or the
Membership Control Agreement.  Compliance with the foregoing provisions
shall not be deemed as satisfaction of any obligations that the Company,
members and governors owe under N.D.C.C. ch.10-32 and the Company,
members, and governors remain responsible for these obligations.

3.      Defendants Jon Wagner and Janet Schol are hereby dismissed as to all claims with
prejudice.

4.      A hearing will be scheduled to consider the handling of costs and attorney fees,
including whether any costs and attorney fees may be paid by Eagle Eye, and, if so,
how this will be handled in terms of the ownership interests of the parties.

5.      This is not a final order.  The court retains jurisdiction to resolve  the issue of costs
and attorneys fees as part of the substantive relief to be awarded by the court.  The
clerk is instructed not to enter judgment until ordered to do so by the court.

Dated this 16th day of August, 2006.


                              /s/ Charles S. Miller, Jr.
                              Charles S. Miller, Jr.
                              United States Magistrate Judge